## IN THE UNITED STATES DISTRICT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JARANIN CHAROEN COMPANY LIMITED, Derivatively on behalf of ARCHER-DANIELS-MIDLAND COMPANY | Case No. 24-cv-2562 |
| Plaintiff, | **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** |
| v. | **DEMAND FOR JURY TRIAL** |
| JUAN R. LUCIANO, MICHAEL S. BURKE, THEODORE COLBERT, JAMES C. COLLINS, JR., TERRELL K. CREWS, SUSAN F. HARRISON, PATRICK J. MOORE, DEBRA A. SANDLER, LEI Z. SCHLITZ, KELVIN R. WESTBROOK, VIKRAM LUTHAR, AND RAY YOUNG, | |
| Defendants, | |
| -and- | |
| ARCHER-DANIELS-MIDLAND COMPANY | |
| Nominal Defendant. | |

This Complaint alleges the directors and/or officers of Archer-Daniels-Midland Company ("ADM" or the "Company") breached their fiduciary duties to the Company, were unjustly enriched, wasted corporate assets, and committed violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). Plaintiff Jaranin Charoen Company Limited ("Plaintiff"), by and through Plaintiff's undersigned counsel, derivatively on behalf of Nominal Defendant ADM, alleges upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters, based upon, among other things, Plaintiff's counsel's investigation, which included, among other things, a review of Securities and Exchange

Commission ("SEC") filings, news reports, press releases, and other publicly available documents regarding ADM. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by ADM's directors and certain officers and is brought by Plaintiff on behalf of ADM against Defendants Juan R. Luciano, Michael S. Burke, Theodore Colbert, James C. Collins, Jr., Terrell K. Crews, Susan F. Harrison, Patrick J. Moore, Debra A. Sandler, Lei Z. Schlitz, Kelvin R. Westbrook, Vikram Luthar, and Ray Young, (collectively "Defendants") resulting from the breach of fiduciary duties owed by Defendants to ADM and its shareholders during the Relevant Period from April 30, 2020 through January 21, 2024, both dates inclusive (the "Relevant Period"). Plaintiff is, and was at all times relevant hereto, an ADM shareholder whose interests align with all other shareholders throughout the relevant period.

2.      ADM is an agricultural supply chain manager and processor that operates through three main business segments: Ag Services and Oilseeds, Carbohydrate Solutions, and Nutrition. The Nutrition segment is engaged in the manufacturing, sale, and distribution of a range of ingredients and solutions, including plant-based proteins, natural flavors, flavor systems, natural colors, emulsifiers, and other specialty food and feed ingredients.

3.      Over the past decade, ADM has spent billions of dollars trying to expand its Nutrition business to protect against commodity price volatility in its agricultural commodities trading business. The Company acquired WILD Flavors in 2014 for $3 billion and towards the end of 2023, announced it would acquire UK-based flavor and ingredient firm FDL. However, ADM's string of investments in animal feed and pet nutrition failed to meet expectations, and leading up

to the Relevant Period, ADM's Nutrition segment was under pressure due to weak demand for meat alternatives and other products, as well as due to downtime at a large soy processing facility. In October 2023, ADM reported that Nutrition revenues had decreased 4% to $1.8 billion due to lower sales volumes, Nutrition operating profit had decreased 22%, and both Human and Animal Nutrition results were lower compared to the third quarter of 2002.

4.    Throughout the Relevant Period, the Company engaged in a widespread scheme to hide from investors, that contrary to the Company's representations to the public that the Nutrition segment was a future profit-driver for the Company, the Nutrition segment's growth from 2020 through 2022 was inaccurate and subject to improper accounting practices, which misrepresented the Company's true financial results and prospects, including its operating profits.

5.    The truth emerged on January 21, 2024, when ADM announced it had placed its CFO Vikram Luther on leave, "pending an ongoing investigation being conducted by outside counsel for ADM and the Board's Audit Committee regarding certain accounting practices and procedures with respect to ADM's Nutrition segment, including as related to certain intersegment transactions." The Company revealed that its investigation began in response to the receipt of a voluntary document request by the SEC.

6.    As a result, ADM delayed its Q4 and Fiscal Year 2023 earnings release and withdrew its outlook for the Nutrition Segment.

7.    On this news, the price per share of ADM's common stock fell $16.23, or approximately 24%, from closing at $68.19.20 per share to close at $51.69 per share on share on January 22, 2024, wiping out approximately $8.8 billion of ADM's market value.

8.    Given the vital importance of the Nutrition Segment, the Defendants had a duty to monitor the Nutrition Segment much sooner than they did.

9.     However, the Defendants were personally financially motivated to issue the false and misleading statements alleged herein, as they were positioned to personally profit off performance-based compensation packages.

10.     During the Relevant Period, the Defendants breached their fiduciary duties by personally making and/or causing the Company to make a series of materially false and misleading statements and omissions about the true condition of the Company. Specifically, the Defendants willfully or recklessly made and/or caused the Company to make to the investing public certain false and misleading statements and omissions of material fact that failed to disclose, adverse facts pertaining to ADM's Nutrition segment and accounting practices that (1) the Nutrition's segment's financial report and accounting practices did not provide investors with an accurate impression of ADM's performance and future prospects, including reported operating profits; (2) that the Nutrition segment's accounting practices created a heightened risk of regulatory scrutiny and adverse impacts to ADM's business; (3) that based on the foregoing Defendants lacked a reasonable basis for their positive statements about ADM's Nutrition segment and related financial results, growths and prospects; (4) the Company failed to maintain adequate internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

11.     The Defendants' misrepresentations had the effect of misleading the investing public and artificially inflating the Company's stock price during the Relevant Period.

12.     At all relevant times, the Defendants further breached their fiduciary duties by causing the Company to fail to maintain effective disclosure controls and procedures and adequate internal controls.

13.     In light of the Defendants' misconduct-which has subjected the Company,

Defendants Luciano, Luthar, and Young to a federal securities fraud class action lawsuit pending in the United States District Court for the Northern District of Illinois (the "Securities Class Action") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein-the Company will have to expend many millions of dollars.

14.     The Company has been substantially damaged as a result of the Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

15.     Through this Action, Plaintiff seeks to redress the harm caused by Defendants to ADM and its shareholders.

16.     In light of the breaches of fiduciary duty engaged in by the Defendants, most of whom are the Company's current directors, of their collective engagement in fraud and misconduct, of the substantial likelihood of the directors' liability in this derivative action and of Defendants Luciano's, Luthar's, and Young's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of the Board cannot consider a demand to commence litigation against themselves and the other Defendants on the Company's behalf with the requisite level of disinterestedness and independence.

17.     In this derivative action, Plaintiff, a shareholder of ADM stock, seeks to hold accountable the directors and officers whose actions caused and/or permitted the wrongdoing in which the Company has engaged.

## JURISDICTION

18.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1).

19.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

20.     Additionally, diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and the Defendants are citizens of a state and citizens or subjects of a foreign state, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

21.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

22.     The Court has personal jurisdiction over each of the Defendants because each Defendant is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

23.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and ADM maintains its corporate headquarters in this District.

## PARTIES

24.     Plaintiff, Jaranin Charoen Company Limited ("Charoen"), is a resident of Bangkok, Thailand who has owned shares of ADM stock since May 13, 2020, and currently owns 200 shares of the Company's common stock, was a shareholder at the time of the misconduct complained of herein, and has been a shareholder of ADM continuously since that time.

25.     Defendant, Juan R. Luciano ("Luciano"), has served as the Company's CEO and

President since January 2015, and as Chairman of the Board since January 2016. He has been a Director of ADM since 2014 and also serves on the Board's Executive Committee. According to the Company's proxy statement filed on Schedule 14A with the SEC on March 14, 2023 (the "2023 Proxy Statement"), as of March 9, 2023, Defendant Luciano beneficially owned 2,542,386 shares of the Company's common stock. Given that the price of the Company's common stock at the close of trading on March 9, 2023, was $77.99 per share, Defendant Luciano owned approximately $198,280,684 worth of Company stock at that time.

26.     For the fiscal year ended December 31, 2020 (the "Fiscal Year 2020"), Defendant Luciano received $22,749,628 in total compensation from the Company. This included $1,400,004 in salary, $15,940,148 in stock awards, $4,507,300 in non-equity incentive plan compensation, $112,853 change in pension value and nonqualified deferred compensation earnings and $112,853 in all other compensation. For the fiscal year ended December 31, 2021 (the "Fiscal Year 2021"), Defendant Luciano received $23,508,841 in total compensation from the Company. This included $1,400,004 in salary, $15,939,571 in stock awards, $5,320,000 in non- equity incentive plan compensation, $59,843 in change in pension value and nonqualified deferred compensation earnings and $789,423 in all other compensation. For Fiscal Year 2022, Defendant Luciano received $24,749,178 in total compensation from the Company. This included $1,429,174 in salary, $17,727,259 in stock awards, $4,712,540 in non-equity incentive plan compensation, and $880,205 in all other compensation.

27.     The 2023 Proxy Statement stated the following about Defendant Luciano:



**Juan R. Luciano**

**Age:** 61

**Director since:** 2014

**Chair of the Board, Board Committees:** Executive

**Common stock owned:** 2,542,386 (4)

**Percent of class:** *

**Non-Public & Non-Profit Boards; Memberships; Honors**
- **CURRENT:** Rush University Medical Center (Lead Director); Kellogg School of Management, Northwestern University (board member); Intersect Illinois (board member); US-China Business Council (member); Economic Club of Chicago (member); Commercial Club of Chicago (member); The Business Roundtable (member)
- **HONORS:** 2021 International Executive of the Year (Executives' Club Chicago); 2021 Darla Moore School of Business at the University of South Carolina, Leadership Legacy Award; 2020 Outstanding Service in Business Award (Illinois); 2020 Maestro Award (Latino Leaders magazine)

**Public Boards**
- **CURRENT:** Eli Lilly and Company (Lead Director)

PROPOSAL NO. 1 — Election of Directors for a One-Year Term

**Career Highlights**
- **ADM**
  - Chair of the Board, Chief Executive Officer and President (2016-present)
  - Chief Executive Officer and President (2015-2016)
  - President and Chief Operating Officer (2014)
  - Executive Vice President and Chief Operating Officer (2011-2014)
- **The Dow Chemical Company** (a multinational chemical company)
  - Executive Vice President and President, Performance Division (2010-2011)

**Qualifications**

Mr. Luciano has extensive experience directly overseeing the commercial and production activities of ADM's corn, oilseeds, and agricultural services businesses, as well as its research, project management, procurement, and risk management functions. He also has overseen the Company's operational excellence initiatives, which seek to improve productivity and efficiency companywide. He has led the Company's efforts to improve its capital, cost, and cash positions.

28. Defendant Michael S. Burke ("Burke") has served as a Company director since 2018. He serves as a member of the Compensation and Succession Committee and Nominating and Corporate Governance Committee. According to the 2023 Proxy Statement, as of March 9, 2023, Defendant Burke beneficially owned 17,277 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 9, 2023 was $77.99, Defendant Dawson owned approximately $1,347,433 worth of Company stock at that time.

29. For Fiscal Year 2020, Defendant Burke received $300,000 in total compensation from the Company. This included $125,000 in fees earned or paid in cash and $175,000 in stock awards. For Fiscal Year 2021, Defendant Burke received $329,735 in total compensation from the Company. This included $125,000 in fees earned or paid in cash, $186,250 in stock awards, and $18,485 in all other compensation. For Fiscal Year 2022, Defendant Burke received $347,369 in total compensation from the Company. This included $125,000 in fees earned or paid in cash, $125,475 in stock awards and $24,869 in all other compensation.

30. The 2023 Proxy Statement stated the following about Defendant Burke:

Director Nominees



**Michael S. Burke**

**Age:** 59
**Director since:** 2018
**Board Committees:** Compensation and Succession; Nominating and Corporate Governance
**Common stock owned:** 17,277 (1)
**Percent of class:** *

**Non-Public & Non-Profit Boards; Memberships; Honors**
- **CURRENT:** Universal Engineering Sciences (Chair); Westwood Professional Services (board member); SitelogIQ (board member); CarbonCure (board member); Nexii Building Solutions (board member); American Institute of Certified Public Accountants (member); California Bar Association (member)
- **PRIOR:** Business Roundtable (board member; Chair, Infrastructure Committee); Children's Bureau (Vice Chair); World Economic Forum (Co-Chair, Steering Committee, Infrastructure and Urban Development)

**Public Boards**
- **PRIOR** (within past 5 years): AECOM (Chairman)

**Career Highlights**
- **AECOM** (a global infrastructure firm)
  - Chairman and Chief Executive Officer (2015-2020)
  - Chief Executive Officer (2014-2015)
  - President (2011-2014)
  - Other leadership roles (2005-2011)
- **KPMG LLP**
  - Member of Board of Directors (2000-2005)
  - Partner (1995-2005)

**Qualifications**
Mr. Burke brings to the Board his deep expertise in accounting and finance, his experience as a CEO, and his involvement in projects throughout the world. Mr. Burke also brings significant ESG experience, including having built one of the largest environmental engineering firms in the world (a subsidiary of AECOM) focused on sustainability and currently serving as a member of the board of directors of CarbonCure and Nexii Building Solutions, companies focused on reducing the harmful emissions from the utilization of cement in the construction process.

31.     Defendant Theodore Colbert ("Colbert") has served as a Company director since 2021. He is a member of the Audit Committee and the Sustainability and Corporate Responsibility Committee. According to the 2023 Proxy Statement, as of March 9, 2023, Defendant Colbert beneficially owned 5,746 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 9, 2023 was $77.99, Defendant Colbert owned approximately $448,130 worth of Company stock at that time.

32.     For Fiscal Year 2021, Defendant Colbert received $207,038 in total compensation from the Company. This included $205,962 in stock awards and $1,076 in all other compensation. For Fiscal Year 2022, Defendant Colbert received $329,209 in total compensation from the Company. This included $125,000 in fees earned or paid in cash, $197,500 in stock awards, and $6,709 in all other compensation.

33.     The 2023 Proxy Statement stated the following about Defendant Colbert:



**Theodore Colbert**

**Age:** 48

**Director since:** 2021

**Board Committees:** Audit; Sustainability and Corporate Responsibility

**Common stock owned:** 5,746 (2)

**Percent of class:** *

**Non-Public & Non-Profit Boards; Memberships; Honors**

- **CURRENT:** The National Space Council Users Advisory Group (appointed by Vice President Kamala Harris); New Leaders (Chair); The Executive Leadership Council (member); Thurgood Marshall College Fund (Co-Vice Chair); DC College Access Program (board member); Virginia Tech Innovation Campus Advisory Board (board member); Aerospace Industries Association (Vice-Chair)
- **PRIOR:** Georgia Tech President's Advisory Board (two terms)
- **HONORS:** 2022 Black Engineer of the Year Award; 2021 Capital CIO of the Year ORBIE Award for leadership; named one of the Most Influential Black Executives in Corporate America by Savoy magazine in 2020 and 2021; first recipient of the Fisher Center prize for Excellence in Driving Transformation from the Fisher Center For Business Analytics at Berkeley; 2018 Forbes CIO Innovation Award; recognized as one of the Most Powerful Executives in Corporate America by Black Enterprise magazine in 2017; 2017 Morehouse College Bennie Leadership Award for Excellence in Business; 2016 National Society of Black Engineers Golden Torch Legacy Award; HMG Strategy 2016 CIO of the Year; 2015 Ebony Power 100 honoree

**Career Highlights**

- **Boeing** (a global aerospace company)
  - Executive Vice President of The Boeing Company and President and Chief Executive Officer of Boeing Defense, Space & Security (2022-present)
  - Executive Vice President of The Boeing Company and President and Chief Executive Officer of Boeing Global Services (2019-2022)
  - Chief Information Officer and Senior Vice President of Information Technology & Data Analytics (2016-2019)
  - Chief Information Officer and Vice President of Information Technology Infrastructure (2013-2016)
  - Other leadership roles (2009-2013)
- **Citigroup**
  - Senior Vice President of Enterprise Architecture (2007-2009)
- **Ford Motor Company**
  - Various roles in the Information Technology organization (1996-2007)

**Qualifications**

Mr. Colbert brings extensive expertise in corporate leadership to the Board, as well as significant knowledge of information technology, information security, cybersecurity, and data and analytics.

34. Defendant James C. Collin, Jr. ("Collins") has served as a Company director since 2022. He serves as a member of the Compensation and Succession Committee and Sustainability and Corporate Responsibility Committee. According to the 2023 Proxy Statement, as of March 9, 2023, Defendant Collins beneficially owned 943 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 9, 2023 was $77.99, Defendant Collins owned approximately $73,544 worth of Company stock at that time.

35. For Fiscal Year 2022, Defendant Collins received $133,514 in total compensation from the Company. This included $51,291 in fees earned or paid in cash, $82,065 in stock awards and $158 in all other compensation.

36. The 2023 Proxy Statement stated the following about Defendant Collins:



**James C. Collins, Jr.**

**Age:** 60

**Director since:** 2022

**Board Committees:** Compensation and Succession; Sustainability and Corporate Responsibility

**Common stock owned:** 943 (1)

**Percent of class:** *

**Non-Public & Non-Profit Boards; Memberships; Honors**
- **CURRENT:** Vestaron Corporation (board member); University of Delaware College of Agriculture and Natural Resources (Advisory Committee member); University of Tennessee Lone Oaks Farm Advisory Council (board member)
- **PRIOR:** CropLife International (board member); University of Delaware's Alfred Lerner College of Business & Economics (advisory board member); Hagley Museum and Library (board member); US China Business Council (member); Business Roundtable (Special Committee on Equity and Racial Justice; Climate Policy Committee; Trade Committee); Longwood Botanical Gardens (board member); National 4-H Council (board member)

**Public Boards**
- **PRIOR** (within past 5 years): Corteva, Inc.

**Career Highlights**
- **Corteva, Inc.** (a global agricultural and seed company)
  - Chief Executive Officer (2019-2021)
- **DowDuPont**
  - Chief Operating Officer (2017-2019)
- **DuPont**
  - Executive Vice President (2014-2017)
  - Senior Vice President (2013-2014)
  - President Industrial Biosciences (2011-2013)
  - VP Acquisitions and Integration – Danisco (2011)
  - President Crop Protection (2003-2010)

**Qualifications**

Mr. Collins brings to the Board a wealth of expertise in innovation and global agriculture, a strong commitment to diversity and inclusion, and a keen understanding of how to support farmers as companies and farmers work together to improve the sustainability of the agriculture and nutrition value chains. During his time at Corteva, he spearheaded a comprehensive array of initiatives to enhance sustainability, with a strong focus on helping farmers lead with new practices and innovations.

37.     Defendant Terrell K. Crews ("Crews") has served as a Company director since 2011. He is Chair of the Audit Committee and a member of the Executive Committee and Sustainability and Corporate Responsibility Committee. According to the 2023 Proxy Statement, as of March 9, 2023, Defendant Colbert beneficially owned 48,866 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 9, 2023 was $77.99, Defendant Colbert owned approximately $3,811,059 worth of Company stock at that time.

38.     For Fiscal Year 2020, Defendant Crews received $325,000 in total compensation from the Company. This included $150,000 in fees earned or paid in cash and $175,000 in stock awards. For Fiscal Year 2021, Defendant Crews received $397,773 in total compensation from the Company. This included $125,000 in fees earned or paid in cash, $211,250 in stock awards, and $61,523 in all other compensation. For Fiscal Year 2022, Defendant Crews received $424,279 in total compensation from the Company. This included $125,000 in fees earned or paid in cash, $226,250 in stock awards, and $73,029 in all other compensation.

39.     The 2023 Proxy Statement stated the following about Defendant Crews:



**Non-Public & Non-Profit Boards; Memberships; Honors**
- **CURRENT:** Freed-Hardeman University (board member); Teay's River Investments (board member)
- **HONORS:** NACD Directorship 100™ (2015)

**Public Boards**
- **CURRENT:** WestRock Company
- **PRIOR** (within past 5 years): Hormel Foods Corporation

**Career Highlights**
- **Monsanto Company** (a global agricultural and seed company)
  - Executive Vice President, Chief Financial Officer and Vegetable Business CEO (2007-2009)
  - Executive Vice President and Chief Financial Officer (2000-2007)
  - Various other roles (1977-2000)

**Qualifications**
Mr. Crews brings to the Board of Directors extensive expertise in finance and related functions, as well as significant knowledge of corporate development, agri-business, and international operations.

**Terrell K. Crews**

**Age:** 67
**Director since:** 2011
**Board Committees:** Audit (Chair); Executive; Sustainability and Corporate Responsibility
**Common stock owned:** 48,866 (3)
**Percent of class:** *

40. Defendant Susan F. Harrison ("Harrison") has served as a Company director since 2017. She is Chair of the Sustainability and Corporate Responsibility and a member of the Compensation and Succession Committee and Executive Committee. According to the 2023 Proxy Statement, as of March 9, 2023, Defendant Harrison beneficially owned 20,307 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 9, 2023 was $77.99, Defendant Harrison owned approximately $1,583,742 worth of Company stock at that time.

41. For Fiscal Year 2020, Defendant Harrison received $310,000 in total compensation from the Company. This included $135,000 in fees earned or paid in cash and $175,000 in stock awards. For Fiscal Year 2021, Defendant Harrison received $345,995 in total compensation from the Company. This included $125,000 in fees earned our paid in cash, $196,250 in stock awards, and $24,745 in all other compensation. For Fiscal Year 2022, Defendant Harrison received $372,058 in total compensation from the Company. This included $125,000 in fees earned or paid in cash, $215,000 in stock awards, and $32,058 in all other compensation.

42. The 2023 Proxy Statement stated the following about Defendant Harrison:



**Susan F. Harrison**

**Age:** 65

**Director since:** 2017

**Board Committees:** Compensation and Succession; Executive; Sustainability and Corporate Responsibility (Chair)

**Common stock owned:** 20,307 (1)

**Percent of class:** *

**Non-Public & Non-Profit Boards; Memberships; Honors**
- **PRIOR:** Executive Women's Forum of NY (Board Member)
- **HONORS:** NACD Directorship 100™ (2022); Ad Age's 'Women to Watch', YWCA Women Achiever Award; Foundation of Excellence Award in Corporate Leadership Award from the NY State Dental Association

**Public Boards**
- **CURRENT:** WestRock Company, Ashland Inc.

**Career Highlights**
- **Colgate-Palmolive Company** (a global household and consumer products company)
  - President of Global Oral Care (2011-2019)
  - President Hill's Pet Nutrition Inc. North America (2009-2011)
  - Vice President, Marketing (2006-2009)
  - Vice President and General Manager of Colgate Oral Pharmaceuticals, North America, and Europe (2005-2006)
  - Various other roles (1983-2005)

**Qualifications**

Ms. Harrison's qualifications to serve as a director of our company include her extensive leadership, management, operations, marketing, and international experience, along with her ESG experience in overseeing environmentally appropriate packaging and formulas for consumer products.

43. Defendant Patrick J. Moore ("Moore") has served as a Company director since 2003. He is Chair of the Nominating and Corporate Governance Committee and is a member of the Audit Committee and Executive Committee. According to the 2023 Proxy Statement, as of March 9, 2023, Defendant Moore beneficially owned 79,742 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 9, 2023 was $77.99, Defendant Moore owned approximately $6,219,078 worth of Company stock at that time.

44. For Fiscal Year 2020, Defendant Moore received $320,000 in total compensation from the Company. This included $140,000 in fees earned or paid in cash and $175,000 in stock awards and $5,000 in all other compensation. For Fiscal Year 2021, Defendant Moore received $441,798 in total compensation from the Company. This included $125,000 in fees earned our paid in cash, $205,000 in stock awards, and $111,798 in all other compensation. For Fiscal Year 2022, Defendant Moore received $465,414 in total compensation from the Company. This included $125,000 in fees earned or paid in cash, $217,500 in stock awards, and $122,914 in all other compensation.

45. The 2023 Proxy Statement stated the following about Defendant Moore:



**Non-Public & Non-Profit Boards; Memberships; Honors**
- **CURRENT:** North American Review Board of American Air Liquide Holdings, Inc.; St. Louis Zoological Association (board member); Hoverfly Holdings (board member); Engineered Corrosion Solutions (board member)
- **HONORS:** NACD Directorship 100™ (2021)

**Public Boards**
- **CURRENT:** Energizer Holdings, Inc. (Chairman)

**Career Highlights**
- **PJM Advisors, LLC** (a private equity investment and advisory firm founded by Mr. Moore)
  - President and Chief Executive Officer (2011—present)
- **Smurfit-Stone Container Corporation** (a leader in integrated containerboard and corrugated package products and paper recycling) (6)
  - Chairman and Chief Executive Officer (2002-2011)
  - Other roles including Chief Financial Officer, Vice President—Treasurer and General Manager, Industrial Packaging division (1987-2002)
- **Continental Bank**
  - Various roles in corporate lending, international banking, and administration (1975-1987)

**Qualifications**

Mr. Moore brings to the Board his financial expertise and substantial experience in leadership, banking and finance, strategy development, and operations management. Mr. Moore also brings extensive experience in environmental and sustainable practices from his time at Smurfit-Stone and his service on the board of the Sustainable Forestry Initiative, with particular focus on recycling, carbon sequestration, reduction of energy and water usage, and sustainable forestry.

**Patrick J. Moore**

**Age:** 68

**Director since:** 2003

**Board Committees:** Audit; Executive; Nominating and Corporate Governance (Chair)

**Common stock owned:** 79,742 (1)

**Percent of class:** *

46. Defendant Debra A. Sandler ("Sandler") has served as a Company director since 2016. She is a member of the Audit Committee and Nominating and Corporate Governance Committee. According to the 2023 Proxy Statement, as of March 9, 2023, Defendant Sandler beneficially owned 23,117 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 9, 2023 was $77.99, Defendant Sandler owned approximately $1,802,894 worth of Company stock at that time.

47. For Fiscal Year 2020, Defendant Sandler received $300,000 in total compensation from the Company. This included $125,000 in fees earned or paid in cash and $175,000 in stock awards. For Fiscal Year 2021, Defendant Sandler received $341,694 in total compensation from the Company. This included $125,000 in fees earned our paid in cash, $186,250 in stock awards, and $30,444 in all other compensation. For Fiscal Year 2022, Defendant Sandler received $361,484 in total compensation from the Company. This included $322,500 in stock awards, and $38984 in all other compensation.

48. The 2023 Proxy Statement stated the following about Defendant Sandler:



**Debra A. Sandler**

**Age:** 63
**Director since:** 2016
**Board Committees:** Audit; Nominating and Corporate Governance
**Common stock owned:** 23,117 (1)
**Percent of class:** *

**Non-Public & Non-Profit Boards; Memberships; Honors**
- **CURRENT:** Hofstra University (board member); The Executive Leadership Council (member); Pharmavite, LLC (board member)

**Public Boards**
- **CURRENT:** Gannett Co., Inc.; Dollar General Corporation; Keurig Dr Pepper Inc.

**Qualifications**

Ms. Sandler has strong marketing and operating experience and a proven record of creating, building, enhancing, and leading well-known consumer brands as a result of the leadership positions she has held with Mars, Johnson & Johnson, and PepsiCo. Ms. Sandler is a regular speaker on topics such as diversity and inclusion, multicultural business development, and health and wellbeing in the consumer packaged goods industry.

**Career Highlights**
- **LaGrenade Group, LLC** (a marketing consulting firm Ms. Sandler founded to advise consumer packaged goods companies operating in the Health and Wellness space)
  - President (2015-present)
- **Mavis Foods, LLC** (a startup Ms. Sandler founded that makes and sells Caribbean sauces and marinades)
  - Chief Executive Officer (2018-present)
- **Mars, Inc.**
  - Chief Health and Wellbeing Officer (2014-2015)
  - President, Chocolate, North America (2012-2014)
  - Chief Consumer Officer of Mars Chocolate North America (2009-2012)
- **Johnson & Johnson**
  - Various roles, including Worldwide President, McNeil Nutritionals division (1999-2009)
- **PepsiCo**
  - Various roles, including Marketing Vice President (1985-1999)

49. Defendant Lei Z. Schlitz ("Schlitz") has served as a Company director since 2019. She is a member of the Compensation and Succession Committee and Nominating and Sustainability and Corporate Responsibility Committee. According to the 2023 Proxy Statement, as of March 9, 2023, Defendant Sandler beneficially owned 13,277 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 9, 2023 was $77.99, Defendant Schlitz owned approximately $1,035,473 worth of Company stock at that time.

50. For Fiscal Year 2020, Defendant Schlitz received $300,000 in total compensation from the Company. This included $125,000 in fees earned or paid in cash and $175,000 in stock awards. For Fiscal Year 2021, Defendant Schlitz received $324,039 in total compensation from the Company. This included $125,000 in fees earned our paid in cash, $186,250 in stock awards, and $12,789 in all other compensation. For Fiscal Year 2022, Defendant Schlitz received $341,074 in total compensation from the Company. This included $125,000 in fees paid or earned in cash, $197,500 in stock awards, and $18,574 in all other compensation.

51. The 2023 Proxy Statement stated the following about Defendant Schlitz:



**Lei Z. Schlitz**

**Age:** 56

**Director since:** 2019

**Board Committees:** Compensation and Succession; Sustainability and Corporate Responsibility

**Common stock owned:** 13,277 (1)

**Percent of class:** *

**Non-Public & Non-Profit Boards; Memberships; Honors**
- **CURRENT:** Society of Women Engineers (member)
- **HONORS:** Distinguished Alumni Achievement Award (University of Wisconsin-Madison Alumni Association)

**Qualifications**

Dr. Schlitz brings extensive leadership experience in strategy development, growth initiatives, and operational excellence, along with strong sustainability experience, including driving innovations in energy and water efficiency and reduction of global warming potential in the manufacturing process. While at ITW, Dr. Schlitz served as an executive member of Illinois Tool Works' Diversity & Inclusion Council, overseeing the company's diversity and inclusion initiatives. Dr. Schlitz holds a doctorate in mechanical engineering from the University of Wisconsin-Milwaukee, and a bachelor's degree in engineering mechanics from Tsinghua University, China.

**Career Highlights**
- **Johnson Controls** (a global building products company)
  - Vice President and President, Global Products (2022-present)
- **Illinois Tool Works Inc.** (a global multi-industrial manufacturer)
  - Executive Vice President, Automotive OEM (2020-2022)
  - Executive Vice President, Food Equipment (2015-2020)
  - Group President, Worldwide Ware-Wash, Refrigeration, and Weigh/Wrap Businesses (2011-2015)
  - Vice President, Research & Development, and Head of ITW Technology Center (2008-2011)
- **Siemens Energy & Automation**
  - Business Manager for Emerging Businesses, Residential Product Division (2006-2008)
  - Director of Engineering (2001-2006)

52.     Defendant Kelvin R. Westbrook ("Westbrook") has served as a Company director since 2003. He is Chair of the Compensation and Succession Committee and is a member of the Executive Committee and Nominating and Corporate Governance Committee. According to the 2023 Proxy Statement, as of March 9, 2023, Defendant Westbrook beneficially owned 42,136 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 9, 2023 was $77.99, Defendant Westbrook owned approximately $3,286,186 worth of Company stock at that time.

53.     For Fiscal Year 2020, Defendant Westbrook received $320,000 in total compensation from the Company. This included $145,000 in fees earned or paid in cash and $175,000 in stock awards. For Fiscal Year 2021, Defendant Westbrook received $405,072 in total compensation from the Company. This included $125,000 in fees earned or paid in cash, $206,250 in stock awards, and $73,822 in all other compensation. For Fiscal Year 2022, Defendant Westbrook received $419,575 in total compensation from the Company. This included $125,000 in fees paid or earned in cash, $221,250 in stock awards, and $73,325 in all other compensation.

54.     The 2023 Proxy Statement stated the following about Defendant Westbrook:



**Non-Public & Non-Profit Boards; Memberships; Honors**
- **CURRENT:** BJC Healthcare (board member); St. Louis Internship Program (board member)
- **HONORS:** NACD Directorship 100™ (2018)

**Public Boards**
- **CURRENT** T-Mobile US, Inc.; Mosaic Company; Camden Property Trust (Lead Independent Trust Manager)
- **PRIOR** (within past 5 years): Stifel Financial Corp.

**Career Highlights**
- **KRW Advisors, LLC** (a consulting and advisory firm founded by Mr. Westbrook)
  - President and Chief Executive Officer (2007-present)
- **Millennium Digital Media Systems, L.L.C.** (a broadband services company) (6)
  - Chairman and Chief Strategic Officer (2006-2007)
  - President and Chief Executive Officer (1997-2006)

**Qualifications**
Mr. Westbrook brings legal, media, and marketing expertise to the Board. He is a former partner of a national law firm, was the President, Chief Executive Officer, and co-founder of two large cable television and broadband companies, and was or is a member of the board of several high-profile companies, including T-Mobile USA, Inc. and the National Cable Satellite Corporation, better known as C-SPAN. Mr. Westbrook also previously served on the board of a multi-billion-dollar not-for-profit healthcare services company.

**Kelvin R. Westbrook**

**Age:** 67

**Director since:** 2003

**Board Committees:** Compensation and Succession (Chair); Executive; Nominating and Corporate Governance

**Common stock owned:** 42,136 (1)

**Percent of class:** *

55.     Defendant, Vikram Luthar ("Luthar"), served as Senior Vice President of ADM beginning in March 2015 and as Chief Financial Officer ("CFO") of ADM beginning in April 2022 until he was placed on leave on January 21, 2024. Luthar previously served as Chief Financial Officer of ADM's Nutrition business segment from January 2020 to April 2022.

56.     Defendant, Ray Young ("Young"), served as CFO of ADM from December 2010 until April 2022 and as Vice Chairman of ADM before retiring at the end of 2022.

57.     Defendants Burke, Colbert, Collins, Crews, Luciano, Moore, Sandler, Schlitz and Westbrook are referred to collectively as the "Director Defendants." Defendants Luciano, Luthar, and Young are referred to collectively as the "Officer Defendants."

58.     Like the Director Defendants, all of the Officer Defendants hold significant shares of common stock in the Company and owe the same fiduciary duties to the Company as do the Director Defendants.

59.     The Officer Defendants made materially false and misleading statements and omissions during earnings calls, investor conferences and reviewed, approved, signed and certified ADM's annual filings with the SEC which contained materially false and misleading statements and omissions.

60.     Nominal Defendant Archer-Daniels Midland Company is a multinational food

processing and commodities trading company. Its principal executive offices are located in this District at 77 West Wacker Drive, Suite 4600, Chicago, Illinois 60601.

## THE FIDUCIARY DUTIES OF THE DEFENDANTS

61.     By reason of their positions as officers, directors, and/or fiduciaries of ADM and because of their ability to control the business and corporate affairs of ADM, the Defendants each owed ADM and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Defendants were and are required to act in furtherance of the best interests of ADM and its shareholders so as to benefit all shareholders equally.

62.     Each director and officer of the Company owes to ADM and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

63.     The Officer Defendants also had a duty to be honest and truthful to the Director Defendants. The Officer Defendants breached their fiduciary duties and were not acting in good faith if they withheld their knowledge of accounting improprieties from any Director Defendant.

64.     The Defendants, because of their positions of control and authority as directors and/or officers of ADM, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

65.     Each Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The Defendants' conduct complained of herein involves a knowing and culpable violation of their obligations as

directors and officers of ADM, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Defendants who were also officers and directors of the Company has been ratified by the Director Defendants who collectively comprised a majority of the Board at all relevant times.

66.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the New York Stock Exchange, the Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

67.     To discharge their duties, the officers and directors of ADM were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of ADM were required to, among other things:

> (a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to ADM's own Code of Conduct (the "Code of Conduct");
>
> (b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets,

and to maximize the value of the Company's stock;

(c)     remain informed as to how ADM conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of ADM and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that ADM's operations would comply with all applicable laws and ADM's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, inter alia, each of the subjects and duties set forth above.

68.     Each of the Defendants further owed to ADM and the shareholders the duty of loyalty requiring that each Defendant favor ADM's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

69.     At all times relevant hereto, the Defendants were the agents of each other and of ADM and were at all times acting within the course and scope of such agency.

70.     Because of their advisory, executive, managerial, and directorial positions with ADM, each of the Defendants had access to adverse, non-public information about the Company.

71.     The Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by ADM.

72.     Defendants owe fiduciary duties to ADM and its shareholders, including duties of loyalty, good faith, and candor.

73.     ADM's Code of Conduct provides, in part, as follows:

> While it may not cover every possible situation we will encounter, our Code, along with our Company policies provide guidance on:
>
> - Acting with integrity
>
> - Complying with applicable laws, rules, and regulations that govern our business
>
> - Where to go for additional information, advice, and guidance when we need it
>
> - Speaking up if we see something that doesn't align with our values or this Code
>
> Our Code applies to all employees, officers, directors, contract workers and agents of ADM, our divisions, and affiliates in all countries (collectively referred to as "ADM" or the "Company" in this document.)
>
> Keep in mind that violations of the Code may also violate the law and can have serious consequences for our Company and the individuals involved. Violations of our Code or Company policies will lead to disciplinary action, up to and including termination of employment…
>
> We Have Integrity
>
> To make a positive impact we must:
>
> - Maintain complete, accurate, and timely books and records for

> our areas of responsibility
>
> -
> - Follow all internal controls and applicable accounting policies and legal or regulatory requirements…
>
> - Cooperate with internal and external auditors, investigators, and regulators
>
> - Report any actual or suspected accounting or auditing errors or irregularities, or violations of internal controls to the Controller or to Compliance promptly

> Anyone who intentionally mispresents or falsifies information in our books and records, or assists others to do so, has engaged in fraud. Fraudulent activity is against the law and our Code of Conduct, and may result in legal liability for those involved.

> If a governmental investigation is to take place, local management must contact Compliance before proceeding.

> If you know that documents in your control may be relevant to a lawsuit or government investigation, do not alter, conceal, or destroy any of those documents.

74. The "We Follow the Law" section includes the following slides:



## We Follow The Law

We are each responsible to know, understand, and follow the laws and regulations that govern the work we do on behalf of the Company. While we cannot cover all of the laws that apply to our business in this Code, we have included some of the most important ones for all of us to understand. These laws can be complex and may vary by country, so if you have any questions or concerns about the right thing to do, seek advice from the Legal department or Compliance team before taking any action.



## Fair Competition and Fair Dealing

We are encouraged to compete aggressively for business and sales opportunities, but we must always do it the right way. That means that we compete fairly in the marketplace and comply with the laws that promote free and fair competition. These laws, called competition or antitrust laws, vary by country but they generally prohibit activities that can restrict competition.

### We Follow The Law

We must always be extremely careful whenever we interact with our competitors so that there can be no perception that we are engaged in any improper discussions or agreements. Even the appearance of violating competition laws can be a problem.

We must never enter into formal or informal agreements with customers, suppliers, or other business partners that may unfairly restrict competition or participate in other abusive behavior.

We must always engage in fair and ethical sales and marketing practices. This means we truthfully emphasize the quality of our products and services, and never say anything false, disparaging, or misleading about our competitors or their products or services.

We may appropriately gather competitive intelligence that is publicly available or has been provided to us through proper means. We must never attempt to obtain a competitor's confidential or proprietary information directly or through illegal or unethical practices.

Violations of competition and antitrust laws can carry criminal penalties and result in significant civil legal damages for both the Company and individuals involved so if you have any questions, please seek guidance from Compliance.



## Do:

✓ Compete aggressively but fairly

✓ Win business based on truthful and accurate statements about the quality of our products and services

✓ Acquire competitive information through good work rather than illegal or unethical practices

## Don't:

✗ Discuss pricing, markets, territory, production, or customer information with a competitor

✗ Say anything false or misleading about our own or a competitor's products or services

✗ Make any agreement that could be seen as restricting competition



## Insider Trading

During the course of our work at the Company, we may come across material inside information about ADM or one of its business partners. We must remember that:



- **We cannot buy or sell stock in ADM or any other company based on inside information**

- **We cannot provide inside information or a "tip" to a family member, friend, or any other person**

- **We must avoid even the appearance of violating these rules**

Trading on inside information or tipping others to do so is against the law and Company policy and can result in severe consequences for the individuals involved. If you are not sure whether certain information would be considered material inside information or if you have any questions about the laws and regulations that govern securities trading, ask the Legal department before taking any action.

75.     Regarding Conflicts of Interest, the Company states as follows:



### Conflicts of Interest

We must always act in the Company's best interests and avoid any actual or perceived conflicts of interest.



A **conflict of interest** can arise from any situation where our personal interests, including those of our family members, friends, and associates could interfere with our ability to make sound, objective business decisions on behalf of the Company. If you think you may be involved in a potential conflict of interest, you must be transparent and promptly disclose the situation to your supervisor and the Compliance team using the **Disclosure Tool**. Most conflicts of interest can either be avoided entirely or resolved easily if they are promptly and properly disclosed.

24

**Principles for Avoiding Conflicts of Interest:**

- Do not use your influence at ADM to benefit yourself or others in a way that competes with ADM or could be perceived as improper, such as personally speculating in agricultural commodities processed by ADM

- Do not work for a company that competes with ADM

- Understand and follow the disclosure requirements before you invest in a company that competes with or does business with ADM

- Do not make decisions regarding the selection or evaluation of suppliers if a family member or someone with whom you have a close personal relationship is involved

- Do not exchange gifts or entertainment with suppliers or customers that could impair your business judgment or otherwise create a conflict of interest

- Do not supervise or make employment decisions related to a family member or someone with whom you have a close personal relationship

- Do obtain approval from Compliance before accepting officer or director positions with an outside business or not-for-profit board

- Do ensure that any second job or outside business activities do not interfere with your ability to perform your job at ADM

- Do not use ADM information, assets, or resources for your personal gain or the improper gain of others

Keep in mind, some of these principles also apply to our families and those with whom we have a close personal relationship. Conflicts of interest can be difficult to identify and may arise at any time. If you are ever unsure about a situation, speak with your manager, Human Resources representative, or the Compliance team.

76.     ADM's Corporate Governance Guidelines (the "Guidelines") outline several responsibilities of the Board of Directors. Under the section "Director Responsibilities," the Guidelines state the following, in relevant part:

> The basic responsibility of the Directors is to exercise their business judgment to act in a manner that they reasonably believe to be in the best interests of the Company and its stockholders. In discharging this obligation, Directors should be entitled to rely on the honesty and integrity of the Company's senior executives and its outside advisors and auditors.

> In furtherance of its responsibilities, the Board shall (i) review, evaluate, and approve the strategic long-range plans for the Company; (ii) review, evaluate, and approve major resource allocations and capital investments; (iii) review the financial and operating results of the Company; (iv) review, evaluate, and approve plans for senior management succession and development; (v) review, evaluate, and approve compensation strategy as it relates to senior management and other employees of the Company; (vi) adopt, implement, and monitor compliance with the Company's Code of Conduct; (vii) oversee the Company's risk management policies; and (viii) review the Company's objectives and policies relating to sustainability and corporate responsibility.

77.     Under a section titled "Purpose," ADM's Audit Committee Charter (the "Audit Committee Charter") states that the Audit Committee "shall assist the Board of Directors … in the oversight of:

> (1) the integrity of the financial statements of the Company, (2) the effectiveness

of the internal control over financial report, (3) the independent registered public accounting firm's qualifications and independence, (4) the performance of the Company's internal audit function and independent registered public accounting firms, (5) the Company's compliance with legal and regulatory requirements, (6) the effectiveness of the Company's enterprise risk management program, and (7) the performance of the Company's compliance function.

78. In the "Authority and Responsibilities" section, the Audit Committee Charter states

the following, in relevant part:

The Committee shall provide assistance to the Board in fulfilling its oversight responsibility to the shareholders relating to the Company's financial statements and the financial reporting process, preparation of the financial reports and other financial information provided by the Company to any governmental or regulatory body, the systems of internal accounting and financial controls, the internal audit function, the tax function, the annual independent audit of the Company's financial statements, the Company's major risk exposures, the legal compliance and ethics programs as established by management and the Board, and the Company's compliance function. The Committee shall assure that the corporate information gathering, analysis, and reporting systems developed by management represent a good faith attempt to provide senior management and the Board with information regarding material acts, events, and conditions within the Company.

The Committee shall be directly responsible for the appointment, compensation, retention, and oversight of the independent registered public accounting firm, including the resolution of any disagreements between management and the independent registered public accounting firm regarding financial reporting, and each independent registered public accounting firm shall report directly to the Committee. The Committee shall maintain free and open communication with the independent registered public accounting firm, the internal auditors, the Chief Compliance Officer, and management of the Company in fulfilling these responsibilities.

In discharging its oversight role, the Committee is empowered to investigate any matter brought to its attention with full access to all books, records, facilities, and personnel of the Company and the power to retain external counsel or other experts or advisers for this purpose. The Committee shall approve the fees and other retention terms related to any such external counsel, experts, and advisors retained by the Committee. In addition, the Committee will promulgate, and have the authority to assure adherence to, policies and procedures regarding compliance with the law and procedures for circulating these policies and for educating employees regarding compliance with these policies. The Committee shall establish and maintain procedures for the receipt, retention, and treatment of complaints received by the Company regarding accounting, internal accounting controls, or auditing matters and the confidential, anonymous submission by employees of

26

concerns regarding accounting or auditing matters, including any allegations of fraud or material misuse of Company resources. The Committee shall perform such other duties and responsibilities as may be assigned to the Committee by the Board.

79.     In a section titled "Statement of Processes" the Audit Committee Charter describes the principal recurring process of the Committee in fulfilling its responsibilities, stating the following, in relevant part:

1. The Committee shall have a clear understanding with management and the independent registered public accounting firm that the independent registered public accounting firm is ultimately accountable to the Committee, as representatives of the Company's Board and shareholders. The Committee shall be responsible for ensuring that it receives from the independent registered public accounting firm the written disclosures and the letter required by applicable requirements of the Public Company Accounting Oversight Board (the "PCAOB") regarding the independent registered public accounting firm's communications with the Committee concerning independence. The Committee shall engage in a dialogue with the independent registered public accounting firm with respect to any disclosed relationships or services that may impact the objectivity and independence of the independent registered public accounting firm and shall take appropriate action in response to the independent registered public accounting firm's report to satisfy itself of the independent registered public accounting firm's independence. The Committee shall also be responsible for obtaining from the independent registered public accounting firm any reports required of independent registered public accounting firms under NYSE listing standards and for reviewing such reports.

2. The Committee shall approve in advance all audit and non-audit services proposed to be provided by the independent registered public accounting firm and, with respect to non-audit services, shall only approve those services that do not meet the definition of prohibited non-audit services under applicable laws and regulations. This pre-approval requirement shall be subject to applicable de minimus exceptions and shall permit the Committee to delegate the power to grant pre-approvals to subcommittees consisting of one or more members of the Committee, provided that such subcommittee pre-approvals are presented to the full Committee at its next scheduled meeting. ...

5. The Committee shall ensure that the Company establishes, resources, and maintains a professional internal auditing function to serve the interests of the Committee, the Board, and the Company…

9. The Committee shall review the effectiveness of the internal audit function, including compliance with The Institute of Internal Auditors' International Standards for the Professional Practice of Internal Auditing.

10. On a regular basis, the Committee shall meet separately with the General Auditor to discuss any matters that the Committee or the General Auditor believes should be discussed privately.

11. The Committee shall discuss with the internal auditors and the independent registered public accounting firm the overall scope and plans for their respective audits, including the adequacy of staffing and compensation. Also, the Committee shall discuss with management, the internal auditors, and the independent registered public accounting firm the adequacy and effectiveness of the accounting and financial controls, including the Company's system to monitor and manage business risks, and legal, regulatory, and ethical compliance programs. The Committee shall review with the independent registered public accounting firm any audit problems or difficulties and management's response thereto. Further, the Committee shall meet separately with the internal auditors and the independent registered public accounting firm, with and without management present, to discuss the results of their examinations…

19. On at least an annual basis, the Committee shall review with management and the head of the tax department the policies, procedures, significant tax disputes, major uncertain tax positions, compliance, disclosure, and other topics related to the tax function.

20. The Committee shall review, approve, and ratify related-party transactions and assess director independence in accordance with SEC and NYSE requirements.

21. The Committee shall review the interim financial statements, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," with management and the independent registered public accounting firm, both separately and together, prior to the filing of the Company's Quarterly Report on Form 10-Q in accordance with the applicable PCAOB Standards and on a general basis. The Committee shall discuss the results of the quarterly review and any other matters required to be communicated to the Committee by the independent registered public accounting firm under the applicable PCAOB Standards, and shall also discuss with the independent registered public accounting firm the sufficiency of the Company's internal controls. The Committee shall receive information from management about any significant deficiencies or material weaknesses in the design or operation of internal controls.

22. The Committee shall review with management and the independent registered public accounting firm, both separately and together, the financial statements, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," to be included in the Company's Annual Report on Form 10-K (or the annual report to shareholders if distributed prior to the filing of Form 10-K), including their judgment about the

28

quality, not just acceptability, of all critical accounting principles and practices, the reasonableness of significant judgments, any alternative treatments discussed with management and the impact of such alternative treatments, the clarity of the disclosures in the financial statements, and approve if appropriate major changes to the Company's internal auditing and accounting principles and practices. Also, the Committee shall discuss the results of the annual audit, the sufficiency of Company's internal controls and any remedial actions adopted in light of any significant deficiency or material weakness, and any other matters required to be communicated to the Committee by the independent registered public accounting firm under standards of the PCAOB.

23. The Committee shall review and discuss generally with management the Company's policies regarding earnings press releases and information provided to analysts and ratings agencies, including the use of any non-GAAP financial measures.

24. The Committee shall prepare the report to be included in the Company's annual proxy statement as required by the rules of the SEC.

25. The Committee shall annually review its own performance.

26. All actions of the Committee shall be regularly reported to the Board or submitted to the Board for ratification.

80.     The Defendants violated the Code of Conduct, the Guidelines, and the Audit Committee Charter by engaging in or permitting the Company to engage in the scheme to issue materially false and misleading statements to the public, including in the Company's SEC filings, and by facilitating and disguising the Defendants violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of the Exchange Act, and failing to report the same. In further violation of the Code of Conduct, the Guidelines, and the Audit Committee Charter, the Defendants failed to maintain internal controls, failed to maintain the accuracy of Company records and reports, failed to comply with applicable laws and regulations, and failed to conduct business in an honest and ethical manner.

81.     In violation of the Audit Committee Charter, the Defendants on the Audit

Committee conducted little, if any, oversight of ADM's engagement in the scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. Moreover, in further violation of the Audit Committee Charter, the Defendants on the Audit Committee failed to adequately oversee major issues regarding the Company's accounting principles and financial statement presentations and major issues related to the adequacy of the Company's internal controls, including the Company's internal control over financial reporting and disclosure controls and procedures.

## **DEFENDANTS' MISCONDUCT**

82.     ADM is a multinational food processing and commodities trading corporation that engages in the production of oilseeds, corn, wheat, cocoa, and other agricultural commodities. ADM's operations are organized into three business segments: Ag Services and Oilseeds, Carbohydrate Solutions, and Nutrition. The Ag Services and Oilseeds segment includes global activities related to the origination, merchandising, transportation, and storage of agricultural raw materials, and the crushing and further processing of oilseeds such as soybeans and soft seeds into vegetable oils and protein meals. The Carbohydrate Solutions segment includes corn and wheat wet and dry milling, and converts corn and wheat into products and ingredients used in the food and beverage industry. The Nutrition segment serves various end markets including food, beverages, nutritional supplements, and feed and premix for livestock, aquaculture, and pet food. Before increasing its focus on nutrition, ADM's business focused on buying, selling, and processing raw materials such as soy and corn beans.

83.     Historically, ADM and two of its primary competitors, Bunge Global SA and

Cargill Inc., focused on buying, storing, and selling grain and profiting from exclusive information about supply and demand. As technology advanced and facilitated the spread of information, ADM and its competitors sought to diversify. ADM expanded into nutrition, increasing its focus on providing customers with products to help them change the formulation of processed food, such as reducing sugar content while preserving sweetness.

84. ADM's historical business is facing the threat of increased competition for soybeans processing in the United States, as well as declining margins for soybean crushing and ethanol, for which ADM is the third-largest United States producer. As a result, successful diversification and growth of the Nutrition segment would continue to benefit ADM's revenue and stability.

85. Before the Relevant Period, ADM grew its Nutrition segment. In 2014, ADM acquired WILD Flavors for $3 billion. In February 2019, ADM acquired Neovia, an animal feed maker for $1.8 billion.

86. In a press release announcing the acquisition of Revela Foods in December 2023, ADM stated that, "[o]ur flavors business is an important pillar of our Nutrition growth strategy, and we are continuing to add to our flavors pantry to ensure we remain the partner of choice for customers around the globe." ADM touted the growth to its flavors portfolio through acquisitions, "including savory via Eatem Foods; citrus via Florida Chemical Company and Erich Ziegler Citrus; and vanilla via Rodelle" and stated that it "expanded its flavors capabilities globally" with acquisitions including Flavor Infusion South America, organic investments including facilities in China and Germany, and a "growing network of innovation centers spanning Europe, Asia, Latin America and North America."

87. In March 2020, ADM disclosed changes to the incentive compensation plans for

performance periods beginning in 2020 that were "designed to emphasize our focus on the Nutrition segment of our business."

88.    In January 2021, Defendant Luciano stated that ADM's Nutrition business was expected to enter a period in which annual operating profit growth would average 15%, and operating earnings for the Nutrition segment indeed rose more than 20% that year. Despite Defendants' representations to the contrary, that growth was not sustainable and in 2022, Nutrition operating profit was only 7%, and earnings shrank by approximately one fifth in 2023.

89.    Despite these results, Defendant Luthar reported that he expected continued growth in the Nutrition revenue opportunity pipeline in October 2023, "with significant conversions continuing as ADM moves past some near-term demand weakness." ADM also continued to push forward with its aggressive M&A strategy, announcing two additional acquisitions for the Nutrition segment in December 2023, Revela Foods and FDL. In a press release announcing the Revela Foods acquisition on December 18, 2023, ADM touted its prior flavors investments, stating, "ADM is continuing to add to its broad portfolio of flavor ingredients and solutions as it builds a global leader in nutrition."

90.    In reality, Defendants were not in a position to make such statements about ADM's prospects in the Nutrition segment. As a result of Defendants' misleading statements and omissions, investors were unaware that ADM's accounting practices were obscuring the true performance and growth of the Nutrition segment and impacting the accuracy and reliability of ADM's financial statements.

91.    In breach of their fiduciary duties to the Company, the Defendants engaged in a vast scheme to hide from investors the underperformance of the Nutrition Segment. Contrary to their public statements, the Defendants misrepresented its true financial results and prospects.

92.     During the Relevant Period, the Defendants breached their fiduciary duties by personally making and/or causing the Company to make a series of materially false and misleading statements and omissions about the true condition of the Company's business practices. Specifically, the Defendants willfully or recklessly made and/or caused the Company to make to the investing public a series of false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) that the Nutrition segment's financial reporting and accounting practices did not provide investors with an accurate impression of ADM's performance and future prospects, including reported operating profits; b) that the Nutrition segment's accounting practices created a heightened risk of regulatory scrutiny and adverse impacts to ADM's business; c) that, based on the foregoing, Defendants lacked a reasonable basis for their positive statements about ADM's Nutrition segment and related financial results, growth, and prospects and d) that the Company failed to maintain adequate internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

## False and Misleading Statement Made During the Relevant Period

93.     The Relevant Period starts on April 30, 2020, when ADM held an earnings call regarding its financial results for the first quarter of 2020. During the call, Defendant Young stated:

> Nutrition continued its growth trajectory with record results. Our Human Nutrition business, formerly known as WFSI, delivered strong performance and growth across the broad portfolio, including Flavors, Specialty Ingredients and Health & Wellness. Increased sales revenue in North America and EMEA flavors, continued sales growth in alternative proteins and additional bioactives income helped drive improved results. As Juan mentioned earlier, we did see higher demand in some Human Nutrition areas as a result of new wins as well as some pantry loading effects. Animal Nutrition's improved year-over-year results were driven by a strong performance from Neovia, good volumes and margins in feed additives and solid sales in pet care. The prior year quarter also had been negatively impacted by about $10 million in upfront purchase price adjustments related to Neovia. Amino acids were negatively impacted by a year-over-year decline in the global pricing

environment, though prices were directionally improved over Q4 of 2019. We are also very pleased that we met our Neovia synergy targets more than 2 years early.

94.     Defendant Young further stated: "For Nutrition, we feel confident that the business will continue to advance to another calendar year of 20%-plus growth." In response to an analyst's question about the growth of the Nutrition business, and market expansion and the trends driving that business, Defendant Luciano stated:

> When talking about Nutrition, I said to all our investors over the last 1.5 years that they've been supporting us through all the investment phase in Nutrition. And Nutrition have not been showing that in the P&L because this was organic growth, and we have some growing pains into some of these assets as you build them and you have to finance them. But when you see now what's starting to happen is what we predicted before, is all those wins, all that innovation, we always said, we have our value proposition is resonating with our customers. We had that. That line was a little bit masked by all this organic growth that was coming. Now all that organic growth is hitting the P&Ls because these investments are maturing. And you're going to see that, and we grew 23% profit last year. We are growing – we're going to grow another north of 20% this year. You see WFSI during this. So take Neovia and Animal Nutrition out for a minute since the first quarter is a little bit of a strange comparison because we acquired this last first quarter. So -- but if you take WFSI, WFSI has grown earnings at 28% in the first quarter. So we continue a little bit the rhythm of 23% that we delivered last year. And flavors are growing at revenue at 7.8%. So we feel very good about that business. It's a very diversified business. And if anything, we're experiencing COVID with people that come back from this pandemic, like we've seen in Asia, is that people come back with the more -- with an enhanced focus on health and the importance of quality nutrition for their well-being. So we've seen the probiotics.
>
> Our Health & Wellness segment is up, like, 24% in terms of revenue, because the sales of those products are -- for humans is, has been probably reemphasized by all this COVID. So we think that we are in the right segments. We think we have the right product mix. So we feel very bullish about continuing this performance for the Nutrition business.

95.     In a Q2 2020 earnings call on July 30, 2020, Defendant Young stated: Our Nutrition business continued to deliver significant growth, with 35% year-over-year profit improvement for the quarter. Over the first half of the year, adjusted profit for Nutrition is up more than 50%. And despite some COVID-19 impacts, revenue is up about 8% on a constant currency basis, with

growth spread across the entire broad portfolio. Human Nutrition results were substantially higher in the second quarter of 2020 versus the second quarter of 2019.

96.    On the same call, in response to an analyst's question for an update about Nutrition's role "as a contributor to the overall company over the long run[,]" Defendant Luciano stated:

> Yes. Strategically, Eric, I always have -- we always have 2 north, if you will. One is we want to get to the 10% ROIC. And the second is we saw the opportunity to bring growth into the company with extending our value chain into Nutrition. And we always say, you heard me saying, we think that that's a business that could get easily to 25%, 30% of our profits, and it continues to move into that. And to be honest, it's moving probably accelerated -- has accelerated into that number. So we might revisit that number. So we don't have a specific number. But all I wanted to express at that point in time is it will be a meaningful contributor because we saw the opportunity. We saw the potential for that business. And now I think that everybody else is realizing.

> At the beginning, we were in an investment phase. So to a certain degree, some of that performance was masked. But now we're looking at what we are doing in -- look at WFSI. WFSI grew 27%. Of course, Animal Nutrition grew much more than that. And when we look at all the microbiome potential there, that's an incredible accelerator that is still very small. So I think I answered all before to Ken. You have to remember, this is at the beginnings of what we can uncover in terms of profitability. We are just delivering while we are building the business. But there is much more that will come from Nutrition. And I think that if our track record serves us in giving you confidence, trust us, much more is coming from Nutrition.

97.    On February 18, 2021, ADM filed its annual report for the fiscal year ended December 31, 2020 (the "2020 10-K"). The 2020 10-K, was signed by Defendants Burke, Crews, Harrison, Luciano, Moore, Sandler, Schlitz, Young, and Westbrook and contained SOX certifications, signed by Defendants Luciano and Young attesting to the accuracy of the financial statements contained in the 2020 10-K and the disclosure of any fraud committed by the Company, its officers, or its directors.

98.    The 2020 10-K stated the following regarding nutrition revenues "Nutrition revenues increased 2% to $5.8 billion due to higher sales prices ($0.1 billion)."

99.     The 2020 10-K also stated that:

**Nutrition operating profit increased 37%. Human Nutrition delivered strong performance and growth across its broad portfolio.** Strong execution to meet rising customer demand for plant-based proteins and edible beans drove higher results in Specialty Ingredients. Additional income from fermentation and strong sales for probiotics and fiber drove higher performance in Health & Wellness. Flavors continued to deliver strong results. **Animal Nutrition results improved year-over-year driven by strong performance from Neovia, good margins in commercial and livestock premix, and improved margins in amino acids.**

100.    On March 26, 2021, the Company filed its proxy statement on Schedule 14A with the SEC (the "2021 Proxy Statement"). Defendants Burke, Crews, Harrison, Luciano, Moore, Sandler, Schlitz and Westbrook solicited the 2021 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

101.    The 2021 Proxy Statement called for Company shareholders to, inter alia: (1) reelect Defendants Burke, Crews, Harrison, Moore, Luciano, Sandler, Schlitz, and Westbrook to serve as directors of the Board; (2) to elect Defendant Colbert as a director of the Board (3) ratify Ernst & Young LLP as the Company's registered public accounting firm; and (4) approve, on an advisory basis, the compensation of named executive officers.

102.    The 2021 Proxy Statement stated the following regarding the Board's and the Audit Committee's risk oversight functions:

[O]ur company's Board of Directors is responsible for risk oversight, focusing on our company's overall risk management strategy, our company's degree of tolerance for risk, and the steps management is taking to manage our company's risk… The Audit Committee currently maintains responsibility for overseeing our company's enterprise risk management process and regularly discusses our company's major risk exposures, the steps management has taken to monitor and control such exposures, and guidelines and policies to govern our company's risk assessment and risk management processes.

103.    The 2021 Proxy Statement also listed certain responsibilities of the Audit Committee, which at that time included Defendants Crews (as Chair), Moore, and Sandler. These

responsibilities included reviewing: "2. financial statements…5. the auditors' evaluation of internal controls; 6. The company's oversight of risk and the enterprise risk management program; 7. matters of legal and regulatory compliance; 8. the performance of our company's compliance function… and 10. the company's earnings press releases and information provided to analysts and investors."

104.     The Audit Committee also "provides assistance to the Board of Directors in fulfilling its oversight responsibility to the stockholders relating to the Company's (i) financial statements and the financial reporting process, (ii) preparation of the financial reports and other financial information provided by the Company to any governmental or regulatory body, (iii) systems of internal accounting and financial controls, (iv) internal audit functions, (v) annual independent audit of the Company's financial statements, (vi) major risk exposures, (vii) legal compliance and ethics programs as established by management and the Board, (viii) related-party transactions, and (ix) performance of the compliance function."

105.     The 2021 Proxy Statement was materially misleading because it failed to disclose that: (1) contrary to the 2021 Proxy Statement's descriptions of the Board and Audit Committee functions and responsibilities, the Board and Audit Committee were not adequately exercising these functions, were causing or permitting the Company to issue false and misleading statements, and thus the Defendants on the Board were breaching their fiduciary duties; and (2) the Defendants on the Board at that time who were breaching their fiduciary duties were improperly interested in increasing their unjust compensation by seeking shareholder advisory approval of the executive officers' compensation plan.

106.     The 2021 Proxy Statement also failed to disclose: a) that the Nutrition segment's financial reporting and accounting practices did not provide investors with an accurate impression

of ADM's performance and future prospects, including reported operating profits; b) that the Nutrition segment's accounting practices created a heightened risk of regulatory scrutiny and adverse impacts to ADM's business; c) that, based on the foregoing, Defendants lacked a reasonable basis for their positive statements about ADM's Nutrition segment and related financial results, growth, and prospects and d) that the Company failed to maintain adequate internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

107. As a result, the 2021 Proxy Statement was materially false and misleading.

108. As a result of the material misstatements and omissions contained in the 2021 Proxy Statement, Company shareholders, inter alia: (1) reelected Burke, Crews, Harrison, Moore, Luciano, Sandler, Schlitz, and Westbrook to serve as directors of the Board, allowing them to continue to breach their fiduciary duties to the Company; (2) elected Defendant Colbert as a director of the Board to the Board,; (3) ratified Ernst & Young LLP as the Company's registered public accounting firm; and (4) approved, on a non-binding advisory basis, the compensation of named executive officers.

109. In an earnings call on October 26, 2021, Defendant Young stated that "the Nutrition business remains on its solid growth trajectory with 17% higher revenues and 15% on a constant currency basis and 20% higher profits year-over-year and continued strong EBITDA margins." Defendant Young further stated that: "Looking ahead, we expect Nutrition to continue on its impressive growth path, with strength across the Human and Animal Nutrition leading to strong year-over-year earnings expansion in the fourth quarter and a 20% full year growth versus 2020." Defendant Luciano affirmed Nutrition's growth, stating: "Nutrition will continue on its strong growth trajectory, in line with our 15% per annum trend rate goals and on its way to $1 billion in

operating profit in the coming years."

110. On February 17, 2022, ADM filed its annual report for the fiscal year ended December 31, 2021 (the "2021 10-K"). The 2021 10-K was signed by Defendants Luciano, Young, Burke, Colbert, Crews, Harrison, Moore, Sandler, Schlitz, and Westbrook and contained SOX certifications, signed by Defendants Luciano and Young, attesting to the accuracy of the financial statements contained in the 2021 10-K, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

111. The 2021 10-K stated that, "Nutrition revenues increased 16% to $6.7 billion due to higher sales prices ($1.0 billion), partially offset by lower sales volumes of ($0.1 billion)," and further stated:

> **Nutrition operating profit increased 20%. Human Nutrition results were higher than the prior year. Flavors results were up, driven by strong sales across various market segments. In North America and EMEAI, the flavors business delivered strong volumes and improved product mix, particularly in the beverage segment. Specialty Ingredients delivered sales growth in specialty proteins and improved pricing and product mix**, though results were negatively impacted by the effects of higher production costs, normalization of prices in the wholesale ingredients business, and COVID-related shifts in demand across the portfolio. **Health and Wellness results were strong, with robust demand driving strong results in probiotics and fibers. Animal Nutrition results were higher on favorable results in amino acids, driven by improved margins and product mix, partially offset by lower demand and higher input costs as a result of pandemic effects in South America and Asia.**

112. On March 22, 2022, the Company filed its proxy statement on Schedule 14A with the SEC (the "2022 Proxy Statement"). Defendants Burke, Colbert, Crews, Harrison, Luciano, Moore, Sandler, Schlitz and Westbrook solicited the 2022 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

113. The 2022 Proxy Statement called for Company shareholders to, inter alia: (1)

reelect Defendants Burke, Crews, Colbert, Harrison, Moore, Luciano, Sandler, Schlitz, and Westbrook to serve as directors of the Board; (2) ratify Ernst & Young LLP as the Company's registered public accounting firm; and (3) approve, on an advisory basis, the compensation of named executive officers.

114. The 2022 Proxy Statement stated the following regarding the Board's and the Audit Committee's risk oversight functions:

> [O]ur company's Board of Directors is responsible for risk oversight, focusing on our company's overall risk management strategy, our company's degree of tolerance for risk, and the steps management is taking to manage our company's risk… The Audit Committee currently maintains responsibility for overseeing our company's enterprise risk management process and regularly discusses our company's major risk exposures, the steps management has taken to monitor and control such exposures, and guidelines and policies to govern our company's risk assessment and risk management processes. The Audit Committee periodically reports to the Board of Directors regarding significant matters identified with respect to the foregoing. I.

115. The 2022 Proxy Statement also listed certain responsibilities of the Audit Committee, which at that time included Defendants Crews (as Chair), Colbert, Moore, and Sandler. These responsibilities included reviewing: "2. financial statements…5. The auditors' evaluation of internal controls; 6. The company's oversight of risk and the enterprise risk management program; 7. matters of legal and regulatory compliance; 8. the performance of our company's tax, compliance, and insurance function… and 10. the company's earnings press releases and information provided to analysts and investors."

116. The Audit Committee also "provides assistance to the Board of Directors in fulfilling its oversight responsibility to the stockholders relating to the Company's (i) financial statements and the financial reporting process, (ii) preparation of the financial reports and other financial information provided by the Company to any governmental or regulatory body, (iii) systems of internal accounting and financial controls, (iv) the internal audit functions, (v) the tax

function, (vi) the annual independent audit of the Company's financial statements, (vii) major risk exposures, (viii) legal compliance and ethics programs as established by management and the Board, (ix) related-party transactions, and (x) performance of the compliance function."

117.    The 2022 Proxy Statement was materially misleading because it failed to disclose that: (1) contrary to the 2022 Proxy Statement's descriptions of the Board and Audit Committee functions and responsibilities, the Board and Audit Committee were not adequately exercising these functions, were causing or permitting the Company to issue false and misleading statements, and thus the Defendants on the Board were breaching their fiduciary duties; and (2) the Defendants on the Board at that time who were breaching their fiduciary duties were improperly interested in increasing their unjust compensation by seeking shareholder advisory approval of the executive officers' compensation plan.

118.    The 2022 Proxy Statement also failed to disclose that: a) that the Nutrition segment's financial reporting and accounting practices did not provide investors with an accurate impression of ADM's performance and future prospects, including reported operating profits; b) that the Nutrition segment's accounting practices created a heightened risk of regulatory scrutiny and adverse impacts to ADM's business; c) that, based on the foregoing, Defendants lacked a reasonable basis for their positive statements about ADM's Nutrition segment and related financial results, growth, and prospects and d) that the Company failed to maintain adequate internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

119.    As a result, the 2022 Proxy Statement was materially false and misleading.

120.    In the exercise of reasonable care, the Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the

2022 Proxy Statement were materially false and misleading. As a result of the material misstatements and omissions contained in the 2022 Proxy Statement, Company shareholders, inter alia: (1) reelected Burke, Colbert, Crews, Harrison, Moore, Luciano, Sandler, Schlitz, and Westbrook to serve as directors of the Board, allowing them to continue to breach their fiduciary duties to the Company; (2) ratified Ernst & Young LLP as the Company's registered public accounting firm; and (3) approved, on a non-binding advisory basis, the compensation of named executive officers.

121.    On February 14, 2023, ADM filed its annual report for the fiscal year ended December 31, 2022 (the "2022 10-K"). The 2022 was signed by Defendants Luciano, Luthar, Burke, Colbert, Collins, Crews, Harrison, Moore, Sandler, Schlitz, and Westbrook and contained SOX certifications, signed by Defendants Luciano and Luthar, attesting to the accuracy of the financial statements contained in the 2022 10-K, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

122.    The 2022 10-K stated the following regarding Nutrition revenues and operating profit: "Nutrition revenues increased 14% to $7.6 billion due to higher sales prices ($0.2 billion) and higher sales volumes ($0.7 billion)," and:

> **Nutrition operating profit increased 7%. Human Nutrition delivered higher year-over-year results.** Flavors results were lower driven by demand fulfillment challenges, the impact of the strong U.S. dollar in EMEA, softer demand in Asia Pacific, and higher costs in North America. Strong sales growth in alternative proteins, including contribution from the Sojaprotein acquisition, and good demand for texturants offset some higher operating costs to help deliver better year-over-year results in Specialty Ingredients. Health and Wellness was also higher year-over-year, powered by probiotics, including the contribution from the November 2021 Deerland Probiotics and Enzymes acquisition, and robust demand for fiber and Vitamin E. **Animal Nutrition profits were higher than the prior year due primarily to strength in amino acids**

123. During a Q4 2022 earnings call on January 26, 2023, Defendant Luciano stated that: "Our Nutrition business continued to outpace the industry, with 18% constant currency revenue growth for the full year. We delivered an impressive 26% year-over-year revenue growth in BioSolutions. The portfolio of acquisitions we made in the prior year continued to deliver OP above our financial projections."

124. On the same call, in response to an analyst's question about OP growth, Defendant Luciano stated:

> [Y]ou've been witnessing how we built this Nutrition business over the years. This is a business that, if I take out the last 3 years, it has been growing OP by 20%, CAGR, if you will. So it's a business that we continue to add layers of capabilities so we can continue to win at the customer front, whether it's we go from individual ingredients to systems, where we bring functionality to those systems through bioactives, whether we bring sustainability benefits to that through our decarbonization or Regen Ag.
>
> So we continue to add layers to continue to help customers excel at the consumer level. And we see that in our win rates, and we see that in our pipeline. So we have visibility into that. As Vikram said, maybe some of the categories soften a little bit, but our ability to gain share, to win faster than those categories has been demonstrated. I think this year, we grew revenue significantly higher than the market. So when we look forward, as I said in my -- I think one of the earlier answers, we continue to expect bolt-on and M&A -- bolt-on M&A and organic growth. We had 4 companies in 2021. We're building capabilities and new capacity in 2022 that we're going to see onstream in '23, and we're going to continue to grow that.

125. On March 14, 2023, the Company filed its proxy statement on Schedule 14A with the SEC (the "2023 Proxy Statement"). Defendants Burke, Colbert, Collins, Crews, Harrison, Luciano, Moore, Sandler, Schlitz and Westbrook solicited the 2023 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

126. The 2023 Proxy Statement called for Company shareholders to, *inter alia*: (1) reelect Defendants Burke, Colbert, Collins, Crews, Harrison, Luciano, Moore, Sandler, Schlitz, and Westbrook to serve as directors of the Board; (2) ratify Ernst & Young LLP as the Company's

registered public accounting firm; and (3) approve, on an advisory basis, the compensation of named executive officers.

127.    The 2023 Proxy Statement stated the following regarding the Board's and the Audit Committee's risk oversight functions:

> [O]ur company's Board of Directors is responsible for risk oversight, focusing on our company's overall risk management strategy, our Company's degree of tolerance for risk, and the steps management is taking to manage and mitigate our company's risk… The Audit Committee currently maintains responsibility for overseeing our Company's enterprise risk management process and regularly discusses our Company's major risk exposures, the steps management has taken to monitor and control such exposures, and guidelines and policies to govern our Company's risk assessment and risk management processes. The Audit Committee periodically reports to the Board of Directors regarding significant matters identified with respect to the foregoing.

128.    The 2023 Proxy Statement also listed certain responsibilities of the Audit Committee, which at that time included Defendants Crews (as Chair), Colbert, Moore, and Sandler. These responsibilities included reviewing: "2. financial statements;…5. The auditors' evaluation of internal controls; 6. The Company's oversight of risk and the enterprise risk management program; 7. matters of legal and regulatory compliance; 8. the performance of our Company's tax, compliance, and insurance function;… and 10. the Company's earnings press releases and information provided to analysts and investors."

129.    The Audit Committee also "provides assistance to the Board of Directors in fulfilling its oversight responsibility to the stockholders relating to the Company's (i) financial statements and the financial reporting process, (ii) preparation of the financial reports and other financial information provided by the Company to any governmental or regulatory body, (iii) systems of internal accounting and financial controls, (iv) the internal audit functions, (v) the tax function, (vi) the annual independent audit of the Company's financial statements, (vii) major risk exposures, (viii) legal compliance and ethics programs as established by management and the

Board, (ix) related-party transactions, and (x) performance of the compliance function."

130.    The 2023 Proxy Statement was materially misleading because it failed to disclose that: (1) contrary to the 2023 Proxy Statement's descriptions of the Board and Audit Committee functions and responsibilities, the Board and Audit Committee were not adequately exercising these functions, were causing or permitting the Company to issue false and misleading statements, and thus the Defendants on the Board were breaching their fiduciary duties; and (2) the Defendants on the Board at that time who were breaching their fiduciary duties were improperly interested in increasing their unjust compensation by seeking shareholder advisory approval of the executive officers' compensation plan.

131.    The 2023 Proxy Statement also failed to disclose : a) that the Nutrition segment's financial reporting and accounting practices did not provide investors with an accurate impression of ADM's performance and future prospects, including reported operating profits; b) that the Nutrition segment's accounting practices created a heightened risk of regulatory scrutiny and adverse impacts to ADM's business; c) that, based on the foregoing, Defendants lacked a reasonable basis for their positive statements about ADM's Nutrition segment and related financial results, growth, and prospects and d) that the Company failed to maintain adequate internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

132.    In the exercise of reasonable care, the Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2023 Proxy Statement was materially false and misleading.

133.    As a result of the material misstatements and omissions contained in the 2023 Proxy Statement, Company shareholders, inter alia: (1) reelected Burke, Colbert, Collins, Crews,

Harrison, Luciano, Moore, Sandler, Schlitz, and Westbrook to serve as directors of the Board, allowing them to continue to breach their fiduciary duties to the Company; (2) ratified Ernst & Young LLP as the Company's registered public accounting firm; and (3) approved, on a non-binding advisory basis, the compensation of named executive officers.

134.    In an earnings call on April 25, 2023, Defendant Luciano continued to tout ADM's growth in Nutrition, stating that, "Nutrition's growth trajectory for the year remains on course with a double-digit increase in our human Nutrition pipeline compared to this point in 2022." In response to an analyst's question about Nutrition's profits for the year, Defendant Luthar stated: "In Human Nutrition, as we mentioned, we've got a strong pipeline." He attributed an expected slowdown in the first half of the year to Animal Nutrition, but assured investors that "we feel good about Animal Nutrition from a turnaround perspective...we feel strong and good about the 10% plus constant currency OP growth in Nutrition for 2023."

135.    In an earnings call on July 25, 2023, Defendant Luciano stated: In Nutrition, our unique go-to-market strategy continues to drive a larger sales pipeline and deliver double-digit growth in the Flavors business[.]" Defendant Luthar reaffirmed the growth of Nutrition, stating: When looking at Nutrition as a whole, we now expect 2023 results to be similar to the prior years as we expect growth in Human Nutrition to be offset by lower results in Animal Nutrition. However, given the increase in customer innovation we've seen in our Flavors business and our recent wins in pipeline growth across Human Nutrition, as well as the actions we are taking in Animal Nutrition, we remain confident about the future outlook and growth prospects for Nutrition.

136.    Defendant Luthar also touted ADM's progress in Flavors in response to an analyst question about the Nutrition segment, stating:

Flavors. Strong pipeline and win rates. We talked about the largest ever pipeline we've had. Flavors actually grew profits in the first half 9%, 20% in Q2. So that's a very good sign of the recovery we are seeing in parts of the Human Nutrition business. The other thing that's important to note, Flavors actually contributed almost 50% of the overall operating profit for Nutrition in the first half. So that's an important signal as you think about the future growth of Nutrition. Yes, that was primarily driven in the beverage category, but we see green shoots of opportunity in the food category as well.

137.     In response to an analyst question about "the pathway '24, '25 and kind of the achievability of the prior 2025 target" Defendant Luciano stated in pertinent part:

**In the Human Nutrition, margins are much higher and is [*sic*] continue to make it better and more stickier to customers as we develop better solutions. In Animal Nutrition was a margin up story since they were coming from lower margins. So when you think about our numbers are a combination of applying our growing faster than market and our EBITDA margin on sales to a market number.** Of course, this industry, as you can see by ourselves and our competitors is having through tough times, whether it is because customers are either not innovating fast enough or destocking at this point in time and making sure they have their supply chains in order.

**So to the extent that those projections are going to be reduced, our percentages of applied to those numbers will be a smaller number. So we haven't gone through that because, to be honest, we are looking at how do we address our current challenges. So we're not that worried about 2025 right now, we want to make sure we make all the adjustments that we need to make**. And maybe as we talk about the adjustment, let me talk a little bit about Animal Nutrition. Animal Nutrition, as we become more into the business, if you will. We know there is a commodity part, and there is a specialty part. The specialty part matches very well with the -- what the playbook that we have in the human side. And that part is growing and we will continue to accelerate. And Vikram said before, we are repurposing resources to add more of that.

138.     In an earnings call on October 23, 2023, Defendant Luthar stated:

The plant-based protein market has been experiencing destocking and consumer demand softness over the course of the year that will likely persist into next year. Given these recent market dynamics, we have re-scoped our Decatur protein modernization investment project to better match the expected lower growth demand environment. Also, we are leveraging our expertise in creation, design and development to differentiate our product offerings to serve evolving consumer needs. These adjustments will enable a faster pivot to higher growth and more resilient categories such as specialized nutrition, which have synergies across the Nutrition portfolio, and we are rapidly building this revenue pipeline.

Health and Wellness results were higher year-over-year due to double-digit biotech sales and a favorable impact related to the revised commercial agreement with Spiber. **During the quarter, we realized a significant expansion in our revenue pipeline reinforcing the demand for evidence-based solutions.**

In Animal Nutrition, we are beginning to see the cost optimization actions and the expansion of offerings in the specialty feed and ingredient space from earlier this year, driving improved performance. However, the recovery in the base business was more than offset by normalized year-over-year amino acids margins as well as lower profit contribution from the Pet Solutions business.

Looking forward, we anticipate Flavors to finish the year strong driven by growth in EMEA and North America. Health and Wellness operating profit is expected to finish similar to last year. Animal Nutrition operating profit is expected to continue to recover sequentially quarter-over-quarter. Specialty Ingredients operating profit is expected to be down significantly, impacted by the recent Decatur East incident and demand softness.

**All in, we now expect full year 2023 operating profit for Nutrition to be around $600 million. While our results in 2023 have been below our expectations, we expect Nutrition to return to growth in 2024.**

**We will continue to build on the Flavors momentum from 2023. Health and Wellness should maintain its steady performance. The cost actions in the shopper pivot to higher-margin products will enable Animal Nutrition to drive growth, further reinforced by improved go-to-market capabilities.**

139.     Defendant Luthar then announced a raised 2023 earnings outlook, stating: "Even with the softness in Nutrition, and lower-than-expected profit contributions from Wilmar, we are raising our 2023 earnings outlook again and now anticipate full year EPS in excess of $7 per share."

140.     Defendant Luciano affirmed:

**For Nutrition, we expect continued growth in our revenue opportunity pipeline with significant conversions continuing as we move past some near-term demand weakness.** Our expanding results in Flavors continue to signal acceleration across our broader portfolio. We expect the positive revenue growth trends in Health and Wellness to drive into next year, and we're already pivoting Specialty Ingredients towards high potential areas like alternative daily and specialized nutrition.

141.    As discussed above, each of the Defendants participated in and/or caused the issuance of the 2021, 2022, and 2023 Proxies. These Proxies inaccurately assured the investing public that the Board maintained effective controls. These Proxies lacked disclosures of (i) the ineffective internal and disclosure controls at the board level. The Defendants had knowledge of undisclosed material facts alleged herein and knowingly or consciously disregarded them and acted in bad faith by releasing the false and misleading Proxies.

142.    The statements contained in ¶¶ 93-99, 109-111, 121-124, and 134-140 were materially false and misleading and failed to disclose material facts necessary to make the statements not false and misleading. Specifically, the Defendants improperly failed to disclose: a) that the Nutrition segment's financial reporting and accounting practices did not provide investors with an accurate impression of ADM's performance and future prospects, including reported operating profits; b) that the Nutrition segment's accounting practices created a heightened risk of regulatory scrutiny and adverse impacts to ADM's business; c) that, based on the foregoing, Defendants lacked a reasonable basis for their positive statements about ADM's Nutrition segment and related financial results, growth, and prospects and d) that the Company failed to maintain adequate internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

143.    As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

**THE TRUTH EMERGES**

144.    On January 21, 2024, ADM announced that it had placed its CFO Vikram Luther on leave effective immediately. The company said that Luther's "leave is pending an ongoing investigation being conducted by outside counsel for ADM and the Board's Audit Committee

regarding certain accounting practices and procedures with respect to ADM's Nutrition segment, including as related to certain intersegment transactions." The Company also revealed that its investigation was initiated in response to its receipt of a voluntary document request by the SEC. As a result, ADM delayed its Q4 and FY 2023 earnings release and withdrew its outlook for the Nutrition segment.

145.     On this news, the price of ADM common stock declined by $16.23 per share, or approximately 24%, from $68.19 per share to close at $51.69 on January 22, 2024.

## SUBSEQUENT DEVELOPMENTS

146.     On March 12, 2024, the Company filed its annual report for the Fiscal Year 2023 on Form 10-K with the SEC (the "2023 10-K"). The 2023 10-K was signed by Defendants Luciano, Harrison, Moore, Burke, Colbert, Collins, Crews, Sandler, Schlitz, and Westbrook and contained SOX certifications, signed by Defendant Luciano, attesting to the accuracy of the financial statements contained in the 2023 10-K, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

147.     The 2023 10-K stated the following:

The Company has historically disclosed in the footnotes to its financial statements that intersegment sales have been recorded at amounts approximating market. In connection with the Investigation, the Company identified certain intersegment sales that were not recorded at amounts approximating market. The immaterial error corrections generally arise from the measurement of intersegment sales pricing or rebates relating to products sold to the Nutrition reporting segment by the Ag Services and Oilseeds and Carbohydrate Solutions reporting segments. . .

In addition, because the Investigation covers the period between January 2018 and September 2023, the Company is providing below information with respect to the adjustments effected to operating profit for each of the Company's reporting segments for each of the years ended December 31, 2018 through 2023.

148.     The 2023 10-K further identified the impacts on the Nutrition Segment as follows:

Given the timing of the Investigation, no adjustments were effected in the fourth quarter of 2023.

**Impact of the Adjustments on Nutrition Segment Operating Profit**

| (In millions) | Years Ended December 31 | | | | | |
|---|---|---|---|---|---|---|
| | 2023[1] | 2022 | 2021 | 2020 | 2019 | 2018 |
| Segment operating profit, as originally reported for 2022, 2021, 2020, 2019, and 2018 | $ 458 | $ 736 | $ 691 | $ 574 | $ 418 | $ 339 |
| Adjustments | (31) | (68) | (59) | (16) | (27) | (27) |
| Segment operating profit, as revised | $ 427 | $ 668 | $ 632 | $ 558 | $ 391 | $ 312 |

[1] The adjustments set forth in the tables above for the year ended December 31, 2023 reflect adjustments effected for the period January 1, 2023 through September 30, 2023. Given the timing of the Investigation, no adjustments were effected in the fourth quarter of 2023.

149. The 2023 10-K also stated that "the Company identified a material weakness in the Company's internal control over financial reporting related to its accounting practices and procedures for intersegment sales. The material weakness resulted from inadequate control that allowed for certain intersegment sales to be reported at amounts not approximating market", and further stated the following regarding the Company's disclosures and procedures.

> The Company's management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rules 13a-15(f) and 15d-15(f). The Company's internal control system is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements in accordance with generally accepted accounting principles.

> Under the supervision and with the participation of management, including the Company's Chief Executive Officer and interim Chief Financial Officer, the Company's management assessed the design and operating effectiveness of the Company's internal control over financial reporting as of December 31, 2023, based on the framework set forth in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 Framework). Based on this assessment, management concluded that the Company's internal control over financial reporting was not effective as of December 31, 2023 and 2022, due to the material weakness described below.

> A material weakness is a deficiency, or combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of a company's annual or interim financial statements will not be prevented or detected on a timely basis. Because the control deficiency described below could have resulted in a material misstatement of its annual or interim financial statements, the Company determined that this deficiency constitutes a material weakness.

> During the fourth quarter of 2023, in connection with the Investigation, the Company identified a material weakness in its internal control over financial reporting related to the Company's accounting practices and procedures for

intersegment sales. The material weakness resulted from inadequate controls that allowed for certain intersegment sales to be reported at amounts that were not in accordance with ASC 606, Revenue from Contracts with Customers. Specifically, the Company did not have adequate controls in place around measurement of certain intersegment sales between the Nutrition reporting segment and the Ag Services and Oilseeds and Carbohydrate Solutions reporting segments. The absence of adequate controls with respect to the reporting of intersegment sales impacted the accuracy of the Company's segment disclosures and review controls over projected financial information utilized in goodwill and other long-lived asset impairment tests.

## DEFENDANTS HAVE WASTED ADM'S ASSETS

150. As a direct and proximate result of the Defendants' actions, ADM has lost and expended and will continue to lose and expend many millions of dollars.

151. Such expenditures include, but are not limited to, the fees associated with the Securities Class Action, and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

152. Additionally, these expenditures include, but are not limited to, unjust compensation, benefits and other payments provided to Defendants who breached their fiduciary duties to the Company.

153. As a direct and proximate result of the Defendants' conduct, ADM has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

154. Plaintiff brings this action derivatively to redress injuries suffered by ADM as a result of the breaches of fiduciary duties, violations of Section 14(a) of the Exchange Act, unjust enrichment, and corporate waste by Defendants.

155. Plaintiff owned ADM stock during the time of the wrongful course of conduct

constituting the basis for the claims asserted herein and continues to hold such stock.

156.    Plaintiff's stock value was significantly reduced and negatively impacted as a result of the action and/or inactions as alleged herein.

157.    Plaintiff's claims and economic position is not antagonistic to the other shareholders, whose stock value(s) were also significantly and negatively impacted by Defendants' actions and/or inactions as alleged herein.

158.    Plaintiff will adequately and fairly represent the interests of ADM and its shareholders in prosecuting and enforcing its rights and has retained counsel competent and experienced to prosecute this action.

## **DEMAND ON THE ADM BOARD IS EXCUSED AS FUTILE**

159.    Plaintiff incorporates by reference and realleges each and every re-allegation set forth above, as though fully set forth herein.

160.    A pre-suit demand on the Board of ADM is futile and, therefore, excused.

161.    At the time of the filing of this action, the Board includes the Director Defendants. Plaintiff needs only to allege demand futility as to six of the eleven directors.

162.    Demand is excused because, in order to properly prosecute this lawsuit, it would be necessary for the directors to sue themselves and the other defendants, requiring them to expose themselves and their comrades to millions of dollars in potential civil liability and criminal or SEC sanctions. This they will not do. Specifically, in addition to ADM, Defendant Luciano , Luthar Young have been named as a defendant in the Securities Class Action asserting violations of §§10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5 in connection with ADM's issuance of materially false and misleading statements and financial reports. Luciano's participation, along with that of Defendant Luthar and Young in the alleged fraud is detailed in the Securities Class

Action Complaint, and because all of the other board members are and/or were beholden to Defendants Luciano, Luthar and/or Young, they cannot effectively investigate and prosecute the claims detailed herein.

163.    Demand is excused as to all of the Defendant Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

164.    In complete abdication of their fiduciary duties, the Director Defendants either knowingly or recklessly participated in the foregoing scheme. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. Moreover, the Director Defendants caused the Company to fail to maintain internal controls over financial reporting and to fail to maintain effective disclosure controls and procedures. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

165.    Additional reasons that demand on Defendant Luciano is futile follow. Defendant Luciano as served as the Company's CEO and President since January 2015. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Luciano with his principal occupation for which he receives spectacular compensation. For instance, Defendant Luciano has received more than $70 million in compensation from the Company between 2020 and 2022. As the Company's highest and most trusted officer and director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements,

consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, Defendant Luciano signed, and thus personally made, the false and misleading statements contained in the 2020, 2021 and 2022 10-Ks. Moreover, the 2021, 2022 and 2023 Proxy Statements were solicited on his behalf, and the false and misleading statements contained therein contributed to his reelection to the Board. Moreover, Defendant Luciano is a defendant in the Securities Class Action. For these reasons, Defendant Luciano breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

166.    Additional reasons that demand on Defendant Burke is futile follow. Defendant Burke has served as a Company director since 2018. He serves as a member of the Compensation and Succession Committee and Nominating and Corporate Governance Committee. Defendant Burke signed, and thus personally made, the false and misleading statements contained in the 2020, 2021 and 2022 10-Ks. Moreover, the 2021, 2022, and 2023 Proxy Statements were solicited on his behalf, and the false and misleading statements contained therein contributed to his reelection to the Board. As a trusted director throughout the Relevant Period, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. He also receives handsome compensation from the Company. For these reasons, Defendant Burke breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

167.    Additional reasons that demand on Defendant Colbert is futile follow. Defendant

Colbert has served as a Company director since 2021. He is a member of the Audit Committee and the Sustainability and Corporate Responsibility Committee. Defendant Colbert signed, and thus personally made, the false and misleading statements contained in the 2021 and 2022 10-Ks. The 2022 and 2023 Proxy Statements were solicited on his behalf, and the false and misleading statements contained therein contributed to his reelection to the Board. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, he served as a member of ADM's Audit Committee and, in that capacity, he failed to oversee, inter alia, the integrity of the Company's financial statements, the Company's internal control over financial reporting, and the effectiveness of its disclosure controls and procedures, as he was required to do under the Audit Committee Charter. For these reasons, Defendant Colbert breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

168. Additional reasons that demand on Defendant Collins is futile follow. Defendant Collins has served as a Company director since 2022. He serves as a member of the Compensation and Succession Committee and Sustainability and Corporate Responsibility Committee. Defendant Collins signed, and thus personally made, the false and misleading statements contained in the 2022 10-K. The 2023 Proxy Statement was solicited on his behalf, and the false and misleading statements contained therein contributed to his reelection to the Board. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to

protect corporate assets. For these reasons, Defendant Collins breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

169.     Additional reasons that demand on Defendant Crews is futile follow. Defendant Crews has served as a Company director since 2011. He is Chair of the Audit Committee and a member of the Executive Committee and Sustainability and Corporate Responsibility Committee. Defendant Crews signed, and thus personally made, the false and misleading statements contained in the 2020, 2021 and 2022 10-Ks. The 2021, 2022 and 2023 Proxy Statements was solicited on his behalf, and the false and misleading statements contained therein contributed to his reelection to the Board . As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, he served as a member of ADM's Audit Committee and, in that capacity, he failed to oversee, inter alia, the integrity of the Company's financial statements, the Company's internal control over financial reporting, and the effectiveness of its disclosure controls and procedures, as he was required to do under the Audit Committee Charter. For these reasons, Defendant Crews breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

170.     Additional reasons that demand on Defendant Harrison is futile follow. Harrison has served as a Company director since 2017. She is Chair of the Sustainability and Corporate Responsibility and a member of the Compensation and Succession Committee and Executive Committee. Defendant Harrison signed, and thus personally made, the false and misleading

statements contained in the 2020, 2021 and 2022 10-Ks. The 2021, 2022 and 2023 Proxy Statements were solicited on her behalf, and the false and misleading statements contained therein contributed to her reelection to the Board. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Harrison breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

171.    Additional reasons that demand on Defendant Moore is futile follow. Defendant Moore has served as a Company director since 2003. He is Chair of the Nominating and Corporate Governance Committee and is a member of the Audit Committee and Executive Committee. Defendant Moore signed, and thus personally made, the false and misleading statements contained in the 2020, 2021, and 2022 10-Ks. The 2021, 2022, and 2023 Proxy Statements were solicited on his behalf, and the false and misleading statements contained therein contributed to his reelection to the Board, which he improperly benefitted from. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, he served as a member of ADM's Audit Committee and, in that capacity, he failed to oversee, inter alia, the integrity of the Company's financial statements, the Company's internal control over financial reporting, and the effectiveness of its disclosure controls and procedures, as he was required to do under the Audit Committee Charter. For these reasons, Defendant Moore breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or

disinterested, and thus demand upon him is futile and, therefore, excused.

172. Additional reasons that demand on Defendant Sandler is futile follow. Defendant Sandler has served as a Company director since 2016. She is a member of the Audit Committee and Nominating and Corporate Governance Committee. Defendant Sandler signed, and thus personally made, the false and misleading statements contained in the 2020, 2021 and 2022 10-Ks. The 2021, 2022, and 2023 Proxy Statements were solicited on her behalf and the false and misleading statements contained therein contributed to her reelection to the Board, which she improperly benefitted from. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Moreover, she served as a member of ADM's Audit Committee and, in that capacity, she failed to oversee, inter alia, the integrity of the Company's financial statements, the Company's internal control over financial reporting, and the effectiveness of its disclosure controls and procedures, as she was required to do under the Audit Committee Charter. For these reasons, Defendant Sandler breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

173. Additional reasons that demand on Defendant Schlitz is futile follow. Defendant Schlitz has served as a Company director since 2019. She is a member of the Compensation and Succession Committee and Nominating and Sustainability and Corporate Responsibility Committee. Defendant Schlitz signed, and thus personally made, the false and misleading statements contained in the 2020, 2021 and 2022 10-Ks. The 2021, 2022 and 2023 Proxy Statements were solicited on her behalf, and the false and misleading statements contained therein

contributed to her reelection to the Board, which she improperly benefitted from. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Schlitz breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

174.    Additional reasons that demand on Defendant Westbrook is futile follow. Defendant Westbrook has served as a Company director since 2003. He is Chair of the Compensation and Succession Committee and is a member of the Executive Committee and Nominating and Corporate Governance Committee. Defendant Westbrook signed, and thus personally made, the false and misleading statements contained in the 2020, 2021 and 2022 10-Ks. The 2021, 2022, and 2023 Proxy Statements were solicited on his behalf and the false and misleading statements contained therein contributed to his reelection to the Board, which he improperly benefitted from. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Westbrook breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

175.    Additional reasons that demand on the Board is futile follow.

176.    The Directors have longstanding business and personal relationships with each other and the Defendants that preclude them from acting independently and in the best interests of

the Company and its shareholders. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Defendants' conduct. Thus, demand upon the Directors would be futile.

177. The Audit Committee Defendants, consisting of Defendants Crews, Colbert, Moore, and Sandler, served as members of ADM's Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendant, are responsible for, among other things, assisting in the oversight of the integrity of the financial statements of the Company and the effectiveness of the internal control over financial reports. The Audit Committee Defendants failed to adequately oversee the Company's reporting processes, and identify or remedy deficiencies with the Company's internal controls, and failed prevent the Company from issuing false and misleading financial statements with the SEC. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested or independent, and demand is excused as to them.

178. The Directors violated the Code of Conduct, Company policy, the Guidelines, the Audit Committee Charter, and the Company's other corporate governance documents by engaging in or permitting the scheme to issue materially false and misleading statements to the public, including in the Company's SEC filings, and by facilitating and disguising the Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, abuse of control, gross mismanagement, violations of the Exchange Act, and failing to report the same. Further, in violation of the Code of Conduct and the Company's policies, the Defendants failed to maintain internal controls, failed to maintain the accuracy of Company records and reports, and failed to comply with applicable laws and regulations.

179. The Company has been and will continue to be exposed to significant losses due to

the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against the Defendants or others who were responsible for that wrongful conduct to attempt to recover for the Company the damages the Company suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

180. The Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Defendant Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

181. The acts complained of herein constitute violations of fiduciary duties owed by the Company's officers and directors, and these acts are incapable of ratification.

182. The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of the Company. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, inter alia, the "insured-versus-insured exclusion." As a result, if the Directors were to sue the Directors or certain of the officers of the Company, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit

is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

183.     If there is no directors' and officers' liability insurance, then the Directors will not cause the Company to sue the Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

184.     Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least five of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## CLAIMS FOR RELIEF

### COUNT I
**Against the Director Defendants for Violations of
Section 14(a) of the Exchange Act**

185.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

186.     The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to those non-fraud claims.

187.     Section 14(a) of the Exchange Act provides that "[i]t shall be unlawful for any person, by use of the mails or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations at the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to

solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

188.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statements shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

189.    Under the direction and watch of the Director Defendants, the Company's 2021, 2022, and 2023 Proxy Statements (the "Proxy Statements") failed to disclose, *inter alia,* the illegal scheme described herein, and that the Company failed to maintain adequate controls and oversight to prevent such wrongful conduct, thus rendering the Proxy Statements false and misleading.

190.    In the exercise of reasonable care, the Director Defendants should have known that by misrepresenting or failing to disclose the forgoing material facts, the statements contained in the Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to the Company's shareholders in voting on matters set forth for shareholder determination in the Proxy Statements, including the election of directors, advisory approval of the executive compensation, and ratification of the Company's independent auditor.

191.    The Company was damaged as a result of the Director Defendants' material misrepresentations and omissions in the Proxy Statements.

192.    Plaintiff, on behalf of ADM, has no adequate remedy at law.

## COUNT II
### Breach of Fiduciary Duty Against All Defendants

193.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth

above, as though fully set forth herein.

194.    Each Defendant owed to the Company the duty to exercise candor, good faith, due care, and loyalty in the management and administration of ADM's business and affairs.

195.    Each of the Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, due care, reasonable inquiry, oversight and supervision.

196.    The Defendants' conduct set forth herein was due to their intentional or reckless breaches of the fiduciary duties they owed to ADM, as alleged herein. The Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect ADM's rights and interests.

197.    In breach of their fiduciary duties owed to the Company, the Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and/or omissions of material fact that failed to disclose, inter alia: a) that the Nutrition segment's financial reporting and accounting practices did not provide investors with an accurate impression of ADM's performance and future prospects, including reported operating profits; b) that the Nutrition segment's accounting practices created a heightened risk of regulatory scrutiny and adverse impacts to ADM's business; c) that, based on the foregoing, Defendants lacked a reasonable basis for their positive statements about ADM's Nutrition segment and related financial results, growth, and prospects and d) that the Company failed to maintain adequate internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

198.    The Defendants failed to correct and/or caused the Company to fail to correct the false and misleading statements and/or omissions of material fact, which renders them personally liable to the Company for breaching their fiduciary duties.

199. Also in breach of their fiduciary duties, the Defendants caused the Company to fail to maintain internal controls and effective disclosure controls and procedures.

200. The Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

201. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

202. As a direct and proximate result of the Defendants' breaches of their fiduciary obligations, the Company has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Defendants are liable to the Company.

203. Plaintiff, on behalf of ADM, has no adequate remedy at law.

### COUNT III
### Corporate Waste Against All Defendants

204. Plaintiff incorporates by reference and realleges each and every re-allegation set forth above, as though fully set forth herein.

205. As a direct result of their wrongdoing herein, Defendants have wasted ADM's valuable corporate assets by, among other things, causing ADM to pay excessive and improper

compensation, fees, and salaries to Defendants who breached their fiduciary duties and by causing the Company to incur millions of dollars of legal liability or legal costs to defend Defendants' unlawful actions and to lose financing from investors and business from future customers who no longer trust ADM and its products. As a result of the waste of corporate assets as alleged herein, Defendants damaged ADM and as such are liable to ADM for corporate waste.

206. Plaintiff, on behalf of ADM, has no adequate remedy at law.

### COUNT IV
### Contribution and Indemnification Against All Defendants

207. Plaintiff incorporates by reference and realleges each and every re-allegation set forth above, as though fully set forth herein.

208. ADM is alleged to be liable to various persons, entities and/or classes by virtue of the same facts as are alleged herein.

209. ADM's alleged liability on account of the wrongful acts, practices and related misconduct described above arises, in whole or in part, from the knowing, reckless, disloyal and/or bad faith acts or omissions of the Defendants as alleged above. ADM is entitled to contribution and indemnification from each Defendant in connections with all such claims that have been, are or may in the future be asserted against, ADM by virtue of the Defendants' misconduct.

210. Additionally, the Company and Defendants Luciano, Luthar, and Young are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when ADM is found liable in the Securities Class Action for these violations of the federal securities laws, ADM's liability will be in whole or in part due to Defendants Luciano's, Luthar's, and Young's willful and/or reckless violations of their obligations as officers and directors of ADM.

211. Defendants Luciano, Luthar, and Young, because of their positions of control and authority as ADM's CEO, President, and Chairman of the Board and CFOs, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of ADM, including the wrongful acts complained of herein and in the Securities Class Action.

212. Accordingly, Defendants Luciano, Luthar, and Young are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act. As such, ADM is entitled to receive all appropriate contribution or indemnification from Defendants Luciano, Luthar and Young pursuant to these statutes as well.

## COUNT V
### Unjust Enrichment Against All Defendants

213. Plaintiff incorporates by reference and realleges each and every re-allegation set forth above, as though fully set forth herein.

214. Through the wrongful course of conduct and actions complained of herein, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Defendants were unjustly enriched at the expense of, and to the detriment to, ADM.

215. The Defendants either benefitted financial from the improper conduct, or received bonuses, stock options, or similar compensation from ADM that was tied to the performance or artificially inflated valuation of ADM, or received compensation or other payments that were unjust in light of the Defendants' bad faith conduct.

216. Plaintiff, as a stockholder of ADM, seeks restitution from the Defendants, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by the Defendants, from their wrongful course of conduct.

217.    Plaintiff, on behalf of ADM, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against all defendants as follows:

A.    Declaring that Defendants have breached their fiduciary duties to ADM and committed other violations of state and federal law, including, but not limited to, corporate waste;

B.    Declaring that Plaintiff may maintain this action on behalf of ADM and that Plaintiff is an adequate representative of the Company;

C.    Appointing Plaintiff's counsel as Lead Counsel for this derivative action;

D.    Determining that this action is a proper derivative action maintainable under law;

E.    Determining that Rule 23.1's pre-suit demand requirement for standing is excused as futile under the circumstances;

F.    Determining and awarding to ADM the damages sustained by it as a result of the violations set forth above from each of the defendants, jointly and severally, together with interest thereon;

G.    Directing ADM to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with ADM's existing governance obligations and all applicable laws and to protect the Company and its shareholders from a recurrence of the damaging events described herein;

H.    Awarding ADM damages including, without limitation, punitive

damages, together with pre-and post-judgment interest to the Company in excess of $25,000 as to all Counts;

I.       Providing extraordinary equitable or injunctive relief as permitted by law or equity, including attaching, impounding, imposing a constructive trust on, or otherwise restricting Defendants' assets so as to assure that Plaintiff, on behalf of ADM, has an effective remedy;

J.       Awarding ADM restitution from Defendants and ordering disgorgement of all profits, benefits, and other compensation obtained by Defendants;

K.       Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

L.       Granting such other and further relief as this Court deems just and equitable.

Plaintiff hereby demands a trial by jury.

Dated: March 29, 2024                    */s/Eric Lechtzin*
                                         Eric Lechtzin, Esq.
                                         Marc H. Edelson, Esq. (*pro hac vice* forthcoming)
                                         EDELSON LECHTZIN LLP
                                         411 S. State Street, Suite N-300
                                         Newtown, PA 18940
                                         T: 215-867-2399
                                         F: 267 685-0676
                                         elechtzin@edelson-law.com
                                         medelson@edelson-law.com